**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT DOUGLAS SMITH, *Petitioner-Appellant*, <br><br> v. <br><br> DORA B. SCHRIRO, Warden, Arizona, Department of Corrections, *Respondent-Appellee.* | Nos. 96-99025 <br> 96-99026 <br> 10-99011 <br><br> D.C. No. CV-87-00234-RMB <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
March 17, 2015—San Francisco, California

Filed February 4, 2016

Before: Mary M. Schroeder, Stephen Reinhardt,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Reinhardt;
Concurrence by Judge Schroeder;
Special Concurrence by Judge Reinhardt;
Dissent by Judge Callahan

# SUMMARY[*]

## Habeas Corpus

The panel reversed Arizona state prisoner Robert Douglas Smith's death sentence in a case to which the Antiterrorism and Effective Death Penalty Act does not apply, and remanded to the district court with instructions to grant the writ of habeas corpus and return the case to the state court to reduce Smith's sentence to life or natural life.

The state court determined on remand that Smith was not intellectually disabled at the time of the offense and trial under *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the execution of intellectually disabled criminals constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

The panel held that because the state court's factual determination is not fairly supported by the record, a presumption of correctness does not apply. Judge Reinhardt would hold (section II.C.2) that deference is not due for the additional and independent reason that the state court rendered its finding that Smith was not intellectually disabled under a constitutionally impermissible legal standard.

Reviewing the record de novo, and considering Smith's intellectual functioning test scores and his history of significantly impaired adaptive behavior, the panel found that Smith satisfied by clear and convincing evidence the two

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

substantive prongs of Arizona's definition of intellectual disability both prior to the age of eighteen and at the time of the crime.

Judge Schroeder concurred in all of Judge Reinhardt's opinion except section II.C.2.

Specially concurring, Judge Reinhardt wrote to convey his serious concerns regarding the constitutionality of Arizona's *Atkins* statute.

Dissenting, Judge Callahan wrote that the majority reaches its conclusion that Smith was not intellectually disabled when he committed the murder by disregarding the findings of the state courts, denying those courts the deference they are due, and expressing supreme confidence in its own ability to detect past intellectual disability despite substantial conflicting evidence and the fact that Smith is not now intellectually disabled.

## COUNSEL

S. Jonathan Young (argued), Williamson & Young, P.C., Tucson, Arizona; Ralph E. Ellinwood, Ellinwood, Francis & Plowman LLP, Tucson, Arizona, for Petitioner-Appellant.

Jeffrey L. Sparks (argued), Assistant Attorney General, Capital Litigation Section, Mark Brnovich, Attorney General, Robert E. Ellman, Solicitor General, Jeffrey A. Zick, Chief Counsel, Capital Litigation Section, Phoenix, Arizona, for Respondent-Appellee.

## OPINION

REINHARDT, Circuit Judge:[1]

This case, to which the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not apply, returns to us following remand to the Arizona state court to conduct an *Atkins* evidentiary hearing. After that hearing the state trial court denied Smith's *Atkins* claim, and the Arizona Court of Appeal and Arizona Supreme Court affirmed. The district court then found Smith's *Atkins* claim without merit and denied his petition for a writ of habeas corpus. We now hold that Smith is intellectually disabled under *Atkins*, and we reverse.[2]

---

[1] Judge Reinhardt's opinion is the opinion of the court except for Section II.C.2. in which neither Judge Schroeder nor Judge Callahan joins.

[2] Because we grant relief on the *Atkins* claim, we find it unnecessary to reach Smith's claim of ineffective assistance of counsel.

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

In 1982, Robert Smith was convicted in Arizona state court of kidnapping, sexual assault, and murder and sentenced to death. *Lambright v. Stewart*, 167 F.3d 477, 479 (9th Cir. 1999), *reh'g granted, vacated*, 177 F.3d 901 (9th Cir. 1999), *rev'd, en banc*, 191 F.3d 1181 (9th Cir. 1999). On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), holding that the execution of intellectually disabled criminals constitutes "cruel and unusual punishment" prohibited by the Eighth Amendment.[4] Under *Atkins*, if Smith was intellectually disabled at the time he committed the crime or at the time of his trial, he may not be executed. We suspended federal habeas proceedings, ordered supplemental briefing and remanded to the state court to determine whether Smith was intellectually disabled and thus ineligible for execution under *Atkins*.

The Pima County Superior Court reopened discovery and held a two-day evidentiary hearing on October 29 and November 1, 2007. The court heard testimony by Dr. Thomas Thompson, a neuropsychologist and prescribing psychologist selected by Smith, who opined that there is a very high probability that Smith was intellectually disabled at the time the crime was committed in 1980. The court also heard testimony from Dr. Sergio Martinez, a psychologist

---

[3] Because the lengthy factual and procedural history of this case is known to the parties and set forth in prior opinions, we recount only those portions directly relevant to the issues discussed herein.

[4] Although both the parties and prior opinions in this case use the term "mental retardation," we employ the term "intellectually disabled." *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014). We use "mental retardation" only when quoting material employing that term.

selected by the State, who stated that there is a high degree of probability that Smith was not intellectually disabled in 1980. The parties entered numerous exhibits into evidence, including the deposition transcripts of twelve lay witnesses who described their observations of Smith as a child or young adult.

Following the hearing, the Pima County Superior Court found on March 27, 2008, that *Atkins* did not preclude Smith's execution. The Arizona Court of Appeals denied special action relief later that year, *Smith v. Kearney*, No. 2 CA-SA 2008-0019, 2008 WL 2721155 (Ariz. Ct. App. July 11, 2008), and the Arizona Supreme Court denied Smith's petition for review. In September 2010, we remanded this case to the district court for the limited purpose of considering Smith's *Atkins* claim. The district court denied the claim in December 2012. Smith timely appealed.

## II. ANALYSIS

### A.  Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. *Sivak v. Hardison*, 658 F.3d 898, 905 (9th Cir. 2011). We review *de novo* the federal district court decision denying Smith's 28 U.S.C. § 2254 habeas petition. *Alvarado v. Hill*, 252 F.3d 1066, 1068 (9th Cir. 2001).

Because Smith filed his federal habeas petition prior to AEDPA's April 24, 1996 effective date, pre-AEDPA standards govern our review even though Smith filed amended petitions subsequent to AEDPA's effective date. *See Sivak*, 658 F.3d at 905 (applying the pre-AEDPA standard of review where initial petition was filed prior to

AEDPA's effective date and amended petitions were filed following AEDPA's enactment); *Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010) (same); *see also Lindh v. Murphy*, 521 U.S. 320, 326 (1997) (holding that Congress intended AEDPA to apply "only to such cases as were filed after [AEDPA's] enactment").

Under pre-AEDPA law, state court factual findings are entitled to a presumption of correctness, subject to eight exceptions enumerated in the previous version of 28 U.S.C. § 2254(d). *Sivak*, 658 F.3d at 905–06. Among the exceptions to the rule regarding a presumption of correctness is the following: the state court's "factual determination is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Because the parties agree that whether Smith is intellectually disabled is a question of fact, we assume for purposes of this opinion that such is the case.[5] The presumption of the correctness also does not apply if the factual determination is based on the application of constitutionally impermissible legal principles. *Lafferty v. Cook*, 949 F.2d 1546, 1551 n. 4 (10th Cir. 1991).

---

[5] The Fourth and Fifth Circuits have held that the question of whether a person is intellectually disabled under *Atkins* constitutes an issue of fact. *See Walker v. Kelly*, 593 F.3d 319, 323 (4th Cir. 2010); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010). The Nevada, Pennsylvania, and Tennessee Supreme Courts have held that the question is instead a mixed question of law and fact. *Ybarra v. State*, 247 P.3d 269, 276 (Nev. 2011); *Commonwealth v. Crawley*, 924 A.2d 612, 615 (Pa. 2007); *State v. Strode*, 232 S.W.3d 1, 8 (Tenn. 2007). We have not yet decided the issue in our Circuit, but have held in a separate context that the question of intellectual disability is a mixed question of law and fact. *See Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1310 (9th Cir. 1987) (whether student was intellectually disabled, as defined by state regulations, for the purpose of the federal Education for All Handicapped Children Act is a mixed question of law and fact).

## B. Legal Standard Governing Determination of Intellectual Disability Under Arizona Law

In 2001, one year before *Atkins* was decided, the Arizona legislature enacted a statute prohibiting the execution of intellectually disabled persons and creating a process by which capital defendants are evaluated for intellectual disability. Ariz. Rev. Stat. Ann. § 13-703.02 (2001), 2001 Ariz. Sess. Laws, Ch. 260, § 2; *State v. Grell* (*Grell I*), 66 P.3d 1234, 1240 (2003). Under the version of the statute in effect at the time of Smith's *Atkins* hearing in 2007, the procedures for evaluating a defendant were automatically triggered upon the State's filing a notice of intent to seek the death penalty. Ariz. Rev. Stat. Ann. § 13-703.02(B) (2006), as amended by 2006 Ariz. Sess. Laws, Ch. 55, § 1.[6] The statute provides that the burden of proving intellectual disability lies with the capital defendant who must prove his disability by "clear and convincing evidence." Ariz. Rev. Stat. Ann. § 13-703.02(G).

The Arizona statute defines "mental retardation" as containing three elements: (1) "significantly subaverage general intellectual functioning" and (2) concurrent "significant impairment in adaptive behavior," (3) "where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." Ariz. Rev. Stat. Ann. § 13-703.02(K)(3). "Significantly subaverage general

---

[6] Section 13-703.02 was subsequently renumbered as § 13-753. 2008 Ariz. Sess. Laws, Ch. 301, § 26. In 2011, the statute was amended to substitute the term "intellectual disability" for "mental retardation." Ariz. Sess. Laws 2011, Ch. 89, § 5. Unless otherwise stated, all references to § 13-703.02 are to the version in effect at the time of Smith's *Atkins* evidentiary hearing.

intellectual functioning" is defined as "a full scale intelligence quotient [IQ] of seventy or lower." Ariz. Rev. Stat. Ann. § 13-703.02(K)(5). "Adaptive behavior" is defined as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." Ariz. Rev. Stat. Ann. 13-703.02(K)(1).

Under Arizona's procedures for determining intellectual disability, the court appoints a prescreening psychological expert to determine the defendant's IQ "using current community, nationally and culturally accepted intelligence testing procedures." Ariz. Rev. Stat. Ann. § 13-703.02(B). If the expert determines that the defendant's IQ is above 75, "the notice of intent to seek the death penalty shall not be dismissed on the ground that the defendant has mental retardation." Ariz. Rev. Stat. Ann. § 13-703.02(C). If the IQ score is 75 or less, however, the court will appoint additional experts in consultation with the parties to prepare reports regarding whether the defendant is intellectually disabled. Ariz. Rev. Stat. Ann. § 13-703.02(D), (E). If at this point all IQ test scores are above 70, the defendant remains eligible for the death penalty. Ariz. Rev. Stat. Ann. § 13-703.02(F).

If the testing demonstrates that the defendant's IQ score is equal to or less than 70, however, the court holds a hearing at which "the defendant has the burden of proving mental retardation by clear and convincing evidence." Ariz. Rev. Stat. Ann. § 13-703.02(G). Under Arizona law, "[c]lear and convincing evidence is that which may persuade that the truth of the contention is 'highly probable.'" *In Re Neville*, 708 P.2d 1297, 1302 (Ariz. 1985) (en banc). A determination by the court that the defendant's IQ is 65 or below "establishes a rebuttable presumption that the defendant has

mental retardation." Ariz. Rev. Stat. Ann. § 13-703.02(G). However, "'[t]he presumption of mental retardation based on the IQ scores vanishes . . . if the State presents evidence that calls into question the validity of the IQ scores or tends to establish that [the] defendant does not otherwise meet the statutory definition of mental retardation.'" *State v. Boyston*, 298 P.3d 887, 895 (Ariz. 2013) (quoting *State v. Arellano*, 143 P.3d 1015, 1019 (Ariz. 2006)); *see Arellano*, 143 P.3d at 1018 ("A rebuttable presumption, however, 'vanishes when the state provides contradictory evidence.'" (citation omitted)). "'At that point, the IQ scores serve as evidence of mental retardation, to be considered by the trial court with all other evidence presented.'" *Boyston*, 298 P.3d at 895 (quoting *Arellano*, 143 P.3d at 1019).

Smith did not have the benefit of this procedural framework at the time of his trial because the trial took place nearly twenty years before the procedural framework's adoption. The Arizona Supreme Court has held that in cases presenting *Atkins* claims in such a post-trial posture, courts should use *Atkins* as a guide and apply the pre-trial procedures of § 13-703.02 to the extent practical. As the Arizona Supreme Court explained in a capital case predating the passage of § 13-703.02,

> We recognize that the procedures set forth in section 13-703.02 are not applicable in Grell's case, as section 13-703.02 did not take effect until after Grell's sentencing. Moreover, the procedures contemplated by section 13-703.02 are pre-trial procedures, triggered when the State files its notice of intent to seek the death penalty. The trial court should use *Atkins* as a guide and should, insofar as is

> practical in the post-trial posture of this case, follow the procedures established in [Ariz. Rev. Stat.] section 13-703.02.

*Grell I*, 66 P.3d at 1241 (footnote omitted); *accord Arellano*, 143 P.3d at 1017 ("[Ariz. Rev. Stat. § 13-703.02] applies to all capital sentencing proceedings, including post-conviction proceedings brought to determine whether a defendant meets the statutory definition of mental retardation.").

## C. Presumption of Correctness

As an initial matter, we must determine whether a presumption of correctness applies to the state court's factual determination that Smith was not intellectually disabled at the time of the offense and trial. We conclude that it does not. As discussed in section II.C.1, we hold that the state court's factual determination is not entitled to deference because it is "not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Also, as explained in section II.C.2, Judge Reinhardt would hold that deference is not due for the additional and independent reason that the Pima County Superior Court rendered its finding that Smith was not intellectually disabled under a constitutionally impermissible legal standard.

### 1. The State Court's Factual Determination Is Not Fairly Supported By the Record

Our case law provides some guidance for determining when the exception codified at § 2254(d)(8) applies. Where the record is ambiguous, a state court's factual determination is "fairly supported by the record" within the meaning of § 2254(d)(8). *Palmer v. Estelle*, 985 F.2d 456, 459 (9th Cir. 1993); *see Wainwright v. Goode*, 464 U.S. 78, 85 (1983).

Where the great majority of the evidence strongly points against the state court's finding, however, the finding is not fairly supported. We have held that a factual determination is not fairly supported by the record even if it is supported by some evidence and other evidence is equally consistent with both the state court's conclusion and a contrary conclusion, so long as the record as a whole "strongly suggests" a different conclusion. *See Carriger v. Stewart*, 132 F.3d 463, 473–76 (9th Cir. 1997).

This standard must also be read in the context of the Supreme Court's recent decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014). In *Hall*, the Court emphasized that, in death penalty cases where a defendant's intellectual functioning is a close question, the defendant "must be able to present additional evidence of intellectual disability . . . ." *Id.* at 2001. In fact, in these situations, the court must not "view a single factor as dispositive" given the complexity of intellectual disability assessments. *Id.* Therefore, a court reviewing the whole record as required by the standard at issue must consider all indications of a defendant's intellectual disability and may not discard relevant evidence.

Here, we do not defer to the state court's ultimate conclusion that Smith was not intellectually disabled because it lacks fair support in the record as a whole.[7] Nor do we defer to the state court's weighing of the evidence where its

---

[7] The mere fact that the record contains contrary opinions by two expert witnesses does not render it ambiguous. Once we look behind each expert's conclusion and consider the evidence on which he relies, it becomes clear that the great majority of the evidence strongly reinforces Dr. Thompson's opinion and that Dr. Martinez's contrary conclusion lacks even fair evidentiary support.

decisions to discount certain evidence similarly lack fair evidentiary support or result from legal error.[8]  The evidence in this case overwhelmingly supports our conclusion that Smith satisfied both substantive prongs of intellectual disability—significantly subaverage general intellectual functioning and significant impairment in adaptive behavior—both prior to age eighteen and at the time of the crime.

### a.  Application of *Atkins*

The state trial court correctly concentrated its analysis on whether Smith was intellectually disabled at the time of the offense and the ensuing trial.  In *Atkins*, the Court identified two rationales supporting its holding.  First, concentrating on the time of the offense, the Court recognized that intellectually disabled offenders are less culpable for their crimes.  *Atkins*, 536 U.S. at 317; *see also Hall*, 134 S. Ct. at 1992–93.  Specifically, the Court noted that there is reason to doubt whether either justification it had previously recognized as a basis for the death penalty—retribution and deterrence—applies to intellectually disabled offenders.  *Atkins*, 536 U.S. at 318–19.  These individuals, the Court explained, suffer from impairments leaving them with

---

[8] When a state court's decision to discount certain evidence constitutes a factual determination, we may apply § 2254(d)(8) to determine whether deference is due.  *See Carriger*, 132 F.3d at 473–76, 478 (applying § 2254(d)(8) to reject the state court's ancillary factual determination that a witness lacked credibility and holding, based in part upon our decision to credit that witness's testimony, that the petitioner had satisfied the *Schlup* "miscarriage of justice" standard); *see also Schlup v. Delo*, 513 U.S. 298, 314 (1995).  Where a state court's decision to discount certain evidence results from legal error, the presumption of correctness does not apply.  *See Sivak*, 658 F.3d at 905.

"diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," making them more likely to act on impulse rather than premeditation, and as followers rather than leaders. *Id.* at 318. These limitations diminish the individual's relative culpability for the crime, and, consequently, the retributive justification of the death penalty. *See id.* at 319 ("[T]he severity of the appropriate punishment necessarily depends on the culpability of the offender."); *see also Hall*, 134 S. Ct. at 1992 ("No legitimate penological purpose is served by executing a person with intellectual disability."). They likewise limit the death penalty's deterrent effect, because these impairments "also make it less likely that [intellectually disabled offenders] can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U.S. at 320.

The Court's second rationale concentrates on a defendant's trial in light of the heightened risk that "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution" because they are less able to effectively participate in their own defense for the purpose of making "a persuasive showing of mitigation."[9] *Id.* at 320–21; *see also Hall*, 134 S. Ct. at 1993. Because the

---

[9] Because it applies equally to the time of the crime and trial, the constitutional right announced in *Atkins* is unlike the rights provided by *Pate v. Robinson*, 383 U.S. 375, 378 (1966) (right to not to be tried while legally incompetent), and *Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986) (right not to be executed while insane), which attach, respectively, to the time of trial and execution.

rationales underlying the right announced in *Atkins* concentrate on the time the crime was committed and the ensuing trial, we hold that a defendant comes within the protection of *Atkins* if he can demonstrate that he was intellectually disabled during either of these periods.[10] Consequently, a defendant's present condition is relevant only to the extent that it is probative of his condition during the relevant periods.

The defendant must, of course, qualify under the third prong as well. The onset of the mental disability must have occurred before he reached the age of eighteen.

We turn now to why the record does not fairly support the state court's determination that Smith was not intellectually disabled. In order to do so, we must examine the evidence under the two substantive elements of the Arizona statute, and determine whether the evidence as a whole strongly points to the conclusion that the two statutory conditions existed at the time of the crime or trial, and whether the onset of each condition occurred prior to age eighteen.

---

[10] Many states expressly recognize that *Atkins* applies to individuals who may be deemed intellectually disabled at the time the crime was committed or at trial. *See*, *e.g.*, *Smith v. State*, No. 1060427, 2007 WL 1519869, at *8 (Ala. May 25, 2007); Ark. Code Ann. § 5-4-618(b); Del. Code Ann. tit. 11, § 4209(d)(3)(c); Ga. Code Ann. § 17-7-131(c); *Pizzuto v. State*, 202 P.3d 642, 653, 654 (Idaho 2008); *Chase v. State*, No. 2013-CA-01089-SCT, 2015 WL 1848126, at *3 (Miss. Apr. 23, 2015); S.D. Codified Laws § 23A-27A-26.1; Tenn. Code Ann. § 39-13-203(b); *Ex parte Cathey*, 451 S.W.3d 1, 19 (Tex. Crim. App. 2014); Wash. Rev. Code § 10.95.030(2).

###    b. Significantly    Subaverage    General
          Intellectual Functioning

"'Significantly    subaverage    general    intellectual
functioning' is the touchstone for proving [intellectual
disability] and means 'a full scale intelligence quotient [IQ]
of seventy or lower.'" *State v. Grell* (*Grell III*), 291 P.3d
350, 352 (Ariz. 2013) (quoting Ariz. Rev. Stat. Ann. § 13-
753(K)(5)).[11]   It must be manifested before age eighteen,
Ariz. Rev. Stat. Ann. § 13-703.02(K)(3), and at the time of
the crime or trial, *see Atkins*, 536 U.S. at 317–21.

###    1. Intellectual Functioning Prior to Age
          Eighteen

Smith took the Otis Intelligence Scale Test in April 1964
and again in October of that year, when he was fifteen years
old, receiving scores of 62 and 71, respectively. The score of
62 Smith received the first time he took the test is the more
relevant of the two scores in light of Dr. Thompson's
unrebutted testimony that Smith's second test score of 71 was
inflated by the practice effect of having taken the same test
just several months earlier. Dr. Thompson explained that
under the practice effect, a person scores higher on a test
when it is readministered within a short period of time
because he has become familiar with the test. Arizona courts
and the most current clinical guidelines recognize the practice
effect. *See State ex rel. Thomas v. Duncan*, 216 P.3d 1194,
1195 n. 4 (Ariz. Ct. App. 2009) ("The practice effect occurs
when a person performs better on a test because he or she has

---

[11] The version of the statute in effect at the time of Smith's evidentiary
hearing uses an identical definition. Ariz. Rev. Stat. Ann. § 13-
703.02(K)(5).

taken it before."); *id.* at 1198 (stating that "a defendant may argue that the practice effect impacted the results" of successive IQ tests); Am. Ass'n of Intellectual and Developmental Disabilities, *Intellectual Disability* 38 (11th ed. 2010) [hereinafter AAIDD 11th ed.] (describing research showing the artificial increase in IQ scores when the same instrument is readministered within a short time interval, and stating that established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimation of the examinee's true intelligence); Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013) [hereinafter DSM-V] (identifying the practice effect as a factor capable of affecting test scores).

Under the *Atkins* framework Arizona later adopted, Smith's IQ score of 62 would entitle him to a presumption of intellectual disability. *See* Ariz. Rev. Stat. Ann. § 13-703.02(G). The State, however, "present[ed] evidence that calls into question the validity of the IQ scores or tends to establish that [the] defendant does not otherwise meet the statutory definition of mental retardation." *Boyston*, 298 P.3d at 895 (quoting *Arellano*, 143 P.3d at 1019). Specifically, the State points to the results of IQ test scores administered by Drs. Thompson and Martinez in 2005 and 2007, on which Smith received scores of 89, 91, and 93. These scores demonstrate that Smith is not presently intellectually disabled, and, in the absence of IQ scores documenting Smith's IQ at the time the crime was committed, raise an

inference that he may not have been disabled at that time.[12] Accordingly, "[t]he presumption . . . based on the IQ scores vanishes" and we weigh the evidence as if no presumption had existed. *Id.* (quoting *Arellano*, 143 P.3d at 1019)).[13]

In any event, the Otis test scores remain highly probative of Smith's condition prior to age eighteen. The State asserts that the tests are unreliable, and points to Dr. Thompson's testimony on cross-examination that by 1964 the Otis tests had not been "normed" against the current population for forty years, and that he had not seen the raw data from Smith's Otis tests or any information regarding the conditions under which those tests were administered. Although the lack of contemporary norming may call into some question the accuracy of the test results, Dr. Thompson gave uncontroverted testimony that, due to the Flynn Effect, this would only have caused Smith's scores to be *overstated*. The basic premise of the Flynn effect is that because average IQ scores increase over time, a person who takes an IQ test that

---

[12] Given the substantial time between the commission of the crime and the IQ tests administered by Drs. Thompson and Martinez, this inference is not particularly strong. Moreover, as discussed below, substantial evidence demonstrates that Smith's IQ did in fact fall below the threshold necessary to demonstrate significantly subaverage general intellectual functioning at the time the crime was committed.

[13] While the standard for overcoming the statutory presumption of intellectual disability is not particularly clear, the general rule in Arizona suggests it is low. *Cf. State v. Lewis*, 340 P.3d 415, 420 (Ariz. Ct. App. 2014) ("[A]s with other rebuttable presumptions, the presumption of continued incompetence 'disappears entirely upon the introduction of any contradicting evidence and when such evidence is introduced the existence or non-existence of the presumed [incompetence] is to be determined exactly as if no presumption had ever been operative.'" (quoting *Sheehan v. Pima Cnty.*, 660 P.2d 486, 489 (Ariz. Ct. App. 1982))).

has not recently been normed against a representative sample of the population will receive an artificially *inflated* IQ score. *See* James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psychol. Pub. Pol'y & L. 170, 173 (2006) [hereinafter *Flynn Effect*]. This is because IQ scores are based on a normal distribution curve, and thus an individual's score is meaningful only in relation to the scores of the other people who took the same test. *See* J.C. Oleson, *The Insanity of Genius: Criminal Culpability and Right–Tail Psychometrics*, 16 Geo. Mason L. Rev. 587, 598 (2009). When correcting for the Flynn Effect, "[t]he standard practice is to deduct 0.3 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test." *Flynn Effect*, *supra*, at 173. The AAIDD recognizes the existence of the Flynn Effect and recommends correcting for the age of norms in outdated tests. AAIDD 11th ed., *supra*, at 37; *see also* Am. Ass'n on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports 56 (10th ed. 2002) [hereinafter AAMR 10th ed.]. The Fourth and Eleventh Circuits have also recognized the existence of the Flynn Effect. *See Walker v. True*, 399 F.3d 315, 322–23 (4th Cir. 2005) (reversing district court due to its failure to consider "relevant evidence" of the Flynn effect); *Holladay v. Allen*, 555 F.3d 1346, 1358 (11th Cir. 2009) ("[A]ll of the scores were on WAIS tests, which may have reflected elevated scores because of the Flynn effect.").[14] Without referring to

---

[14] Courts have taken a range of approaches with regard to the Flynn effect. Some courts have gone beyond the Fourth and Eleventh Circuits by mandating its application to defendants' IQ scores. *See Thomas v. Allen*, 614 F.Supp.2d 1257, 1281 (N.D. Ala. 2009) ("A court must also consider the Flynn effect and the standard error of measurement in determining whether a petitioner's IQ score falls within a *range* containing scores that are less than 70."); *United States v. Parker*, 65 M.J. 626, 629

the Flynn effect by name, we too have adjusted IQ scores based on out-of-date norms. *Gregory K.*, 811 F.2d at 1312 n. 2. Here, we conclude that, in light of Dr. Thompson's uncontroverted testimony regarding the impact of the Flynn Effect, Smith's score of 62 on the outdated Otis test renders it highly probable that his IQ at the time of the test was lower than 62, well below the cutoff for demonstrating "significantly subaverage general intellectual functioning" under Arizona law.

The record does not fairly support the state court's determination to afford the Otis test little weight and discount Dr. Thompson's opinion to the extent that he relied on the

───────────

(N-M. Ct. Crim. App. 2007); *People v. Superior Court*, 28 Cal. Rptr.3d 529, 558-559 (Cal. Ct. App. 2005), *overruled on other grounds* ("In determining [a petitioner's] IQ score, consideration must be given to the so-called Flynn effect"). Other courts have left to the trial court's discretion whether to apply the Flynn Effect. *See State v. Burke*, No. 04AP-1234, 2005 WL 3557641, at *13 (Ohio Ct. App. Dec. 30, 2005) ("We conclude that a trial court must consider evidence presented on the Flynn effect, but, consistent with its prerogative to determine the persuasiveness of the evidence, the trial court is not bound to, but may, conclude the Flynn effect is a factor in a defendant's IQ score."). Still other courts have rejected use of the Flynn Effect. *See Bowling v. Commonwealth*, 163 S.W.3d 361 (Ky. 2005) (neither the Flynn effect nor standard margins of error properly are considered); *Howell v. State*, 151 S.W.3d 450, 458 (Tenn. 2004); *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008) ("We have previously refrained from applying the Flynn effect, however, noting that it is an 'unexamined scientific concept' that does not provide a reliable basis for concluding that an appellant has significant sub-average general intellectual functioning."); *In re Mathis*, 483 F.3d 395, 398 n. 1 (5th Cir. 2007) ("The Flynn Effect . . . has not been accepted in this Circuit as scientifically valid.").

test.[15]   Although Dr. Thompson and Dr. Martinez each noted
that additional information regarding the administration of the
test would enhance its validity, neither witness concluded that
the test results were *invalid* in the absence of such
information.   More fundamentally, we decline to disregard
the Otis tests on the basis that Smith is unable to proffer the
same level of detailed evidence regarding their administration
as is available for recent tests administered by court-
appointed psychologists.  Like most states, Arizona places the
burden on a defendant raising an *Atkins* claim to demonstrate,
*inter alia*, significantly subaverage general intellectual
functioning [meaning an IQ of 70 or below] occurring before
the age of eighteen.  Ariz. Rev. Stat. Ann. § 13-703.02(K)(3),
(5).    It is highly unlikely, however, that the people
administering an IQ test to a child would ever anticipate the
use of that test in an *Atkins* proceeding, and at the time of
Smith's tests the constitutional right provided by *Atkins* did
not even exist.  Consequently, records of childhood IQ tests
will rarely include the detailed information collected for IQ
tests administered under court supervision to adjudicate a
defendant's *Atkins* claim.  To discount what may be the only
evidence of subaverage general intellectual functioning prior
to age eighteen on this ground would effectively deny the
protection afforded by *Atkins* to individuals who are
substantially older than eighteen years old, or whose trials
predate *Atkins*, because it would render their intellectual
disability nearly impossible to prove.  Given the evidentiary

---

[15] The state court also noted that expert testimony regarding Quantitative
Electronencephalography (QEEG) testing on Smith, which it held
inadmissible, played a role in Dr. Thompson's opinion that Smith's
functional limitations were related to his frontal lobe dysfunction.
Because testimony regarding the QEEG testing played a non-essential and
limited role in Dr. Thompson's conclusion, his opinion cannot be
discounted on this basis.

challenges so often arising from the retrospective nature of *Atkins* claims, the Eighth Amendment requires that courts apply a more relaxed standard when determining the reliability of evidence documenting childhood onset of intellectual disability. Here, there is no indication that Smith was malingering when he took the Otis tests. Accordingly, although they do not provide a presumption of intellectual disability under Arizona law, we find that Smith's first Otis test score nonetheless "serve[s] as evidence of mental retardation, to be considered by [this] [C]ourt with all other evidence presented.'" *Boyston*, 298 P.3d at 895 (internal quotation marks omitted).

We hold the first Otis test score reliable for the additional reason that it is consistent with Smith's contemporaneous poor academic performance. Under Arizona law, evidence of poor academic performance is evidence of subaverage intellectual functioning. *Williams v. Cahill ex rel. Cnty. of Pima*, 303 P.3d 532, 540 (Ariz. Ct. App. 2013) ("[W]hen no childhood IQ tests were performed, subaverage intellectual functioning before the age of eighteen properly may be inferred from other evidence of intellectual functioning, such as school performance."). Here, the evidence overwhelmingly demonstrates that Smith performed exceedingly poorly in school, scoring in the 2nd to 5th percentiles on the Stanford Achievement Test at age fifteen, placing him five to seven years below his age level and three to five years below grade level. Smith's school transcripts reveal that he received nearly all "Ds" and "F's" in his academic subjects, and that his education did not progress beyond the eighth grade, after which he dropped out of school. The State does not contest the validity of these records. Melva Jane Box, Smith's older sister, testified that Smith was held back in all his grades, was placed in special

education class for slow learners, and was even transferred to a special school "because he couldn't learn." Charles Caperton, one of Smith's childhood neighbors, similarly testified that Smith was placed in special education classes. Taken together, Smith's Otis test scores and poor academic performance overwhelmingly demonstrate that Smith experienced significantly subaverage general intellectual functioning prior to the age of eighteen. The state court's determination to the contrary does not find fair support in the record.

### 2. Intellectual Functioning at the Time of the Crime and Trial

The more fundamental question in this case is whether Smith continued to suffer from subaverage intellectual functioning at the time of the crime and trial. The only evidence to the contrary is the IQ test scores conducted by Dr. Thompson and Dr. Martinez decades after the trial. Thus, the question is the relative weight that can fairly be given to the pre-crime and post-crime test scores insofar as they provide evidence determinative of Smith's intellectual functioning at the time of the crime and trial, and whether the record fairly supports the state court's conclusion that Smith did not experience significantly subaverage general intellectual functioning at that crucial time.

We begin by noting that the subsequent administration of IQ tests by Drs. Thompson and Martinez was substantially more remote from the period of Smith's crime than the administration of the Otis test scores: twenty-five and twenty-seven years after the crime, in the former case, compared to sixteen years in the latter. Accepting each set of test scores as valid measures of Smith's IQ at the time the tests were

administered, this discrepancy renders more probable Smith's assertion that his IQ at the time of the crime approximated the IQ reflected in his first Otis test score rather than his more recent, higher scores.

The key issue, however, is the strength of Smith's evidence demonstrating the probability that his significant gains in IQ score occurred after, rather than before, his incarceration. Dr. Thompson testified that improvements in IQ score similar to those attained by Smith are possible for individuals like Smith whose cognitive problems stem from environmental factors rather than physical injury and who are later given appropriate antidepressant medication and placed in a structured environment. Certainly, Smith adduced substantial evidence of a horribly abusive and impoverished upbringing supporting Dr. Thompson's opinion: he was routinely brutalized by his stepfather, and was subjected to extreme verbal and emotional abuse by his mother, interspersed with neglect and periods of outright abandonment. According to Box, Smith's stepfather would beat him with "whatever was closest . . . . a belt, a stick, a coat hangar," and also molested him. Martha Gau, Smith's younger half-sister, similarly testified that Smith's stepfather would tell him "he was good for nothing and would never amount to anything," and would kick him and whip him with both ends of a belt; she recalled finding Smith's bedsheets covered in blood following one particularly serious beating when he was about twelve or thirteen years old. Caperton saw Smith beaten with a belt "pretty regularly," and witnessed one beating involving use of a two-by-four. Smith's mother frequently left the children alone at a time when Smith was still young enough to be using a high chair. On one occasion when she was actually present, Smith's mother engaged in extra-marital foreplay in the front seat of

her car while Smith sat in the backseat. On another, after the children failed to adequately clean the dishes, she sent them outside with bowls on their heads to pick weeds from the yard while other children from the neighborhood gathered around them and laughed. As a result of this upbringing, Dr. Thompson opined, Smith became intellectually disabled with frontal lobe abnormalities.[16]

As evidence that IQ scores can improve following the commission of the crime in situations similar to Smith's, Dr. Thompson cited robust data demonstrating that the use of antidepressants (which Smith took while incarcerated) can significantly increase brain functioning over time, noted that other death row inmates have attained improved functioning while incarcerated, and provided an anecdote of a patient who achieved a twelve point gain in IQ score after receiving medication for just *four months*. As evidence that his level of

---

[16] The state court committed legal error when it discounted Dr. Thompson's opinion that Smith's abusive upbringing contributed to his intellectual disability, which was manifested by poor test scores and grades, and instead adopted the state's theory that Smith's abusive upbringing itself caused his poor academic performance but that he was not intellectually disabled. The state's theory misapprehends Arizona's definition of intellectual disability, which centers on indicators such as low IQ scores and impaired adaptive behavior and not the purported etiology of these indicators. *See* Ariz. Rev. Stat. Ann. § 13-703.02(K)(1), (3), (5). Simply stated, while the specific cause of intellectual disability is significant with regard to whether the condition is static or mutable, the threshold question whether an individual is intellectually disabled is answered simply by the presence of *impaired functioning* regardless of its purported cause. *See* AAIDD 11th ed., *supra*, at 59–61 (describing intellectual disability as arising from cultural-familial factors, biological factors, or a combination of the two, and stating that "[b]ecause [intellectual disability] is characterized by impaired functioning, its etiology is whatever caused this impairment in functioning.").

functioning improved over the course of his incarceration, Smith adduced testimony from multiple witnesses describing dramatic improvements in the quality of the letters he sent from prison. Gau testified that letters Smith sent her at the beginning of his incarceration were virtually unintelligible, but that over the following years his writing had improved "100 percent," explaining that "it was like a totally different person was writing it." Martha Hight, Smith's aunt by marriage, similarly described Smith's early letters from prison as partially unintelligible, and noted improvements in the letters he sent in later years. Smith also received tutoring while in prison. Ronald Labrecque, who worked for the Department of Corrections from 1986 until 1997, supervised Smith's work on maintenance jobs over an eight year period. Labrecque also tutored Smith, helping him with his reading and providing him reading materials such as working manuals, and described witnessing a "vast improvement" in Smith's reading ability over this time. Smith received additional help from Ed Schad, a fellow inmate, who would get books for Smith from the prison library and have him read them. None of this evidence is refuted by the State.

For his part, although disagreeing with Dr. Thompson's ultimate conclusion, Dr. Martinez agreed with several of his key premises. Dr. Martinez testified that significant IQ gains are possible, and acknowledged that Smith's IQ gains were not without precedent. He also agreed with Dr. Thompson's characterization of prison as a "structured environment." More significant, Dr. Martinez testified that improved functioning is unlikely to occur in the absence of training and educational opportunities (which Smith received in prison from Labrecque and Schad), and stated that there was no indication Smith received any such opportunities *prior to the time of the crime*. This strongly reinforces, and renders

highly probable, Smith's assertion that the improvement in his functioning did not occur until after the crime was committed. For all of these reasons, we hold that the state court's determination that no evidence explains whether the finding of Smith's low childhood IQ could be extrapolated to the time of the crime and trial lacks even fair support in the record.

Dr. Martinez also relied on reports summarizing three Rule 11 competency evaluations Smith underwent in 1981, each of which found Smith competent to stand trial. He specifically cited the conclusion of one evaluator, Dr. LaWall, that Smith "probably functions in the average range of intelligence." Dr. Thompson described the Rule 11 reports as an unreliable assessment of intelligence because they are "very superficial," and "very subjective." He explained that because the reports focus on competency, they comprise estimates of a subject's functioning based only on a brief interview, involve little review of the subject's history, and—more important—include no quantitative assessment of his IQ. Dr. Thompson's critique is consistent with Arizona law and highly persuasive, and Dr. LaWall's assessment of Smith's intelligence carries little weight. *See* Ariz. Rev. Stat. Ann. § 13-703.02(K)(5) (determining whether an individual suffers from significantly subaverage general intellectual functioning requires a quantitative assessment of IQ). The State adduces no other evidence of improved academic performance or other indicia of increased intellectual functioning prior to the commission of the crime. Accordingly, viewing the record as a whole, we hold that Dr. Martinez's conclusion is not fairly supported by the record. Because the remaining evidence supporting the state court's conclusion is minimal, we hold that its conclusion that Smith failed to satisfy the intellectual functioning prong of

Arizona's intellectual disability definition at the of the crime and/or trial is not fairly supported by the record. We hold instead that the evidence overwhelmingly demonstrates that Smith experienced significantly subaverage general intellectual functioning at that dispositive time.[17]

---

[17] The State's citation to cases describing intellectual disability as a static condition does not alter our conclusion, *Heller v. Doe*, 509 U.S. 312, 323 (1993); *Moormann v. Schriro*, 672 F.3d 644, 649 (9th Cir. 2012); *State v. Arellano*, 143 P.3d 1015, 1020 (Ariz. 2006). *Moorman* and *Arellano* each rely on *Heller*, which cites a 1985 report for the proposition that intellectual disability "is a permanent, relatively static condition." *Heller*, 509 U.S. at 323 (citing Samuel J. Brakel et al., *The Mentally Disabled and the Law* 37 (3d ed. 1985)). Thus, all of this case law relies on a single study that substantially predates developments in the clinical understanding of intellectual disability as a fluid condition subject to change. *See* Am. Ass'n on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1, 5 (9th ed. 1992) [hereinafter AAMR 9th ed.] ("With appropriate supports over a sustained period, the life functioning of the person with mental retardation will generally improve."); *id.* at 18 ("Mental retardation begins prior to age 18 but may not be of lifelong duration."); Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 47 (4th ed. 2000) [hereinafter DSM-IV] ("Mental Retardation is not necessarily a lifelong disorder. Individuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks may, with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation."); AAIDD 11th ed., *supra*, at xiii ("ID is no longer considered entirely an absolute, invariant trait of the person."). This contemporary clinical understanding necessarily informs the law on intellectual disability. *See Hall v. Florida*, 134 S. Ct. 1986, 1993 (2014) (stating that legal definitions of intellectual disability "are informed by the work of medical experts"). In addition, unlike the record in this case, none of the cases on which the State relies involves an evidentiary record containing extensive expert testimony describing intellectual disability as a condition that is neither fixed nor static where (as in Smith's case) it is influenced by environmental factors rather than an underlying medical condition.

Moreover, to hold otherwise would contravene the fundamental principles the Supreme Court recently laid out for the benefit of the federal courts and the state judiciary in the landmark case of *Hall v. Florida*, 134 S. Ct. 1986 (2014). In that case, the Court made it clear that a determination of intellectual disability requires, at least in questionable cases, the consideration of significant relevant evidence, not simply a measurement of an IQ test at a particular point in time. Here, the premise on which the state court's decision as to intellectual disability is based is that the IQ tests taken at a critical time–the time prior to Smith's 18th year–must be discounted in large part because, at the time they were taken, the procedures used for such tests were not adequately recorded and the information regarding the administration of such tests was no longer available. This test evidence was not only critical to the initial IQ determination when Smith was 15 but also to the ultimate determination of his intellectual disability at the time of the crimes. To discount the reliability of the tests on such grounds is little different from failing to consider, or excluding, crucial evidence that is not only highly relevant to the principal questions at issue but is indeed critical to arriving at a fair and just answer to the question whether Smith is eligible for capital punishment.

*Hall* reminds us that "the death penalty is the gravest sentence our society may impose," 134 S. Ct. at 2001, and that imposing this "harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being," *id.* at 1992. Given these stakes, *Hall* warns that we must not make judgments in haste as to whether a person has an intellectual disability, but rather must consider all the "substantial and weighty evidence" in cases that present close questions. *Id.* at 1994. Put differently, we cannot risk making the protections of *Atkins* a nullity by

executing a person with an intellectual disability without giving him the "fair opportunity to show the Constitution prohibits [his] execution." *Id*. at 2001. The state court's decision in Smith's case takes that risk. By discounting Smith's early IQ tests even though they were the type used at the time and even though they are the most likely evidence that an intellectually disabled defendant of Smith's age could present in order to prove his condition, the state court judge rendered the protection for the intellectually disabled established by *Atkins* effectively meaningless, which is precisely what the Court sought to avoid in *Hall*. Such a decision, by removing highly probative evidence of a person's intellectual disability in a death-penalty case, not only violates the individual defendant's right but also "contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world." *Id*.

### c. Significantly Impaired Adaptive Behavior

"'Adaptive behavior' means the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." Ariz. Rev. Stat. Ann. § 13-703.02(K)(1). Courts applying this prong must conduct "an overall assessment of the defendant's ability to meet society's expectations of him."[18] *State v. Grell* ("*Grell II*"),

---

[18] Although state courts generally construed *Atkins* as imposing no binding definition of impaired adaptive behavior, the Supreme Court held in *Hall* that states must comply with elements of the clinical definition about which there exists a national consensus. 134 S. Ct. at 1998–99. Because Arizona's definition of adaptive behavior is far more restrictive than the clinical definition, *Williams*, 303 P.3d at 548 (Eckerstrom, P.J., dissenting), and because a national consensus exists with regard to this aspect of the clinical definition, *see* Concurring Opinion of Reinhardt, J.,

135 P.3d 696, 709 (Ariz. 2006) (en banc); *accord Boyston*, 298 P.3d at 895.

Although there is scant case law applying this prong, we find the Arizona Supreme Court's decision in *Grell III*, 291 P.3d 350 (Ariz. 2013), highly instructive. In *Grell III*, the State stipulated that the capital defendant demonstrated significantly subaverage general intellectual functioning but contested the impairment of his adaptive behavior. *Id.* at 352. Independently reviewing the evidentiary record, the court proceeded to hold that Grell had also demonstrated significant deficits in adaptive behavior, and reduced his death sentence to natural life. *Id.* at 351, 357.[19] As evidence of significantly

---

Arizona's definition may well be violative of the rules established in *Hall*, and unconstitutional for that reason. Because *Hall* was not decided until after the state court had rendered its decision denying Smith's *Atkins* claim, however, Smith had no opportunity to make this argument before the state court and the state had no opportunity to respond. In such circumstance, we might remand to allow the state court to consider the more recent Supreme Court decision, although we express no view on that question. Here, however, we need not apply *Hall* in light of our conclusion that Smith clearly satisfies even Arizona's more onerous standard.

[19] Due to the unique procedural posture of the case, the *Grell III* court applied

Ariz. Rev. Stat. Ann. § 13-751(C). Under this statute, a defendant may present evidence at the penalty phase of mitigating circumstances, which must be proven by a preponderance of the evidence. We note that the *Grell III* court applied a lower standard of proof than governs Smith's claim, but nonetheless regard the case as a useful guidepost demonstrating the Arizona Supreme Court's approach to the adaptive behavior prong. *Grell III* contains the Court's most extended analysis on this element and identifies numerous attributes supporting a finding of significantly impaired adaptive behavior.

impaired adaptive behavior, the court considered, *inter alia*, Grell's grade school records showing that he had been placed in special education classes; lay witness testimony describing him as highly impulsive, unable to understand social cues of children his own age, and largely unable to use the few social skills that he had; expert testimony describing Grell's tendency to act more like children several years younger, and noting his impulsiveness and poor communication skills; and testimony from teachers and administrators who observed that Grell was impulsive, inattentive, and unable to communicate effectively. *Id.* at 353–55. Grell also adduced testimony from members of the special education team at his elementary school stating their conclusion that Grell was intellectually disabled. *Id.* at 353. A psychologist opined that the consistency of Grell's poor social functioning and behavioral problems demonstrated the presence of intellectual disability, because problems arising solely from antisocial or personality disorders would vary over time. *Id.* at 354. Grell also presented the expert testimony of an educational psychologist who concluded that

> [g]iven the facts of [Grell's] low intellectual functioning, his inability to learn from his mistakes, his reduced capacity in communication, socialization and self-help skills, and his significant history of special education, followed by failure and dropping out of school and, in the absence of significant parental support and guidance, his subsequent serious entanglement with the criminal justice system, it is clear at this point that Shawn Grell is a person who has mental retardation.

*Id.* at 355.  The court additionally noted Grell's history of running away from home, committing crimes, his inability to hold jobs, and his general immaturity. *Id.* at 356.  Reviewing this evidence, the court concluded that Grell had demonstrated significant deficits in adaptive behavior, notwithstanding evidence of his limited ability to adapt.  *Id.* at 357.

The record in this case paints a remarkably similar picture of Smith, demonstrating consistent traits, beginning in childhood and continuing through the time of the crime, that the *Grell III* court held established impaired adaptive behavior. *See id.* at 354 (consistency of behavioral problems indicates a root cause of intellectual disability, rather than antisocial or personality disorders).  Like Grell, Smith had a "significant history of special education, followed by failure and dropping out of school." *See id.* at 355.  Specifically, Smith was held back in all his grades, placed in special education classes, subsequently transferred to a special school for children unable to learn, and dropped out after the eighth grade, by which time he was already sixteen years old.  These facts are consistent with other testimony providing further evidence of Smith's poor intellectual functioning during his childhood.  Box testified that as a child, Smith had trouble learning and struggled to grasp the rules even of simple children's games like tag and marbles.  Betty Ruth Knight, another former neighbor and the mother of Smith's fifth wife, Beth Lewis, stated that as a child Smith "always looked like he was just lost."

Smith had poor social skills.  According to Delores Elaine Long, one of Smith's childhood neighbors, as a child Smith was unable to interact with, play with, or carry on a conversation with other children. *See Grell III*, 291 P.3d at

353 ("[Grell] could not understand social cues that children his age should understand, and was largely unable to use the few social skills that he had.").  Hight testified that as a young adult Smith lacked any social life, and Gerald Lambright, the cousin of Smith's co-defendant Joe Lambright, described Smith as a "loner."   Other evidence reveals Smith's impulsiveness.  Smith's mother reported that psychiatrists who treated him during his childhood concluded Smith had problems with impulsiveness, which would likely continue throughout his life.  The presentence report also describes Smith's impulsiveness, stating that he "responds to external, social stimuli on a very concrete level, living basically from day to day and acting on impulse to a great degree."  *See id.* at 353–55 (noting Grell's impulsiveness); *Atkins*, 536 U.S. at 318 (stating that intellectually disabled people "often act on impulse rather than pursuant to a premeditated plan").

Smith's communication skills were similarly stunted. Hight testified that, as an adult, Smith had difficulty forming sentences and correctly pronouncing words; for example, he would say "weekie days" when referring to "weekdays." Gau and Hight each described receiving nearly incomprehensible letters from Smith during the early period of his incarceration. *See Grell III*, 291 P.3d at 354–55 (stating that Grell was "unable to communicate effectively" and noting "his reduced capacity in communication").

As in *Grell III*, a lay witness familiar with intellectual disability concluded that Smith was intellectually disabled. Here, Hight stated that she believed Smith to be intellectually disabled, based on her comparison of Smith to her own intellectually disabled sister. *See id.* at 353 (Grell identified as intellectually disabled by special education staff experienced with other disabled children).  Although she was

not an expert, Hight's testimony, based on her personal experience, is highly probative of Smith's adaptive behavior. *See Arellano*, 143 P.3d at 1020 (discussing the relevance of lay witness testimony regarding adaptive behavior).

Other evidence indicates that Smith did not possess the skills necessary to take care of his own needs. Hight described Smith as lacking basic hygiene, unable to sit at the table or eat properly, and unable to take care of himself without assistance. Labrecque testified that he was forced to reprimand Smith on one occasion over his sloppiness, body odor, and infrequent bathing. *See Grell III*, 291 P.3d at 355 ("Dr. Keyes' investigation revealed that Grell's family viewed Grell as 'somewhat incapable of caring for many of his own needs . . . .' He concluded that Grell's record confirmed his adaptive deficits, as illustrated by his lifelong inability 'to conform his behavior to the expected standards of his social and same aged peers.'").

The evidence in this case includes many additional parallels to the evidence presented in *Grell*. Smith tormented his younger half-sister, sexually abusing her at a young age: when he was twelve, Smith was severely punished after persuading Gau to play "doctor" when she was five years old, and when Gau was nine Smith, then sixteen, brought her out to the garage and forced her to perform oral sex on him. Smith made repeated attempts to run away from home after which he was jailed for vagrancy. He frequently got into trouble for criminal activity, including numerous arrests. Hight testified that Smith was unable to hold a job, which she attributed to his inability to "comprehend what a normal person . . . would be able to interpret." The record reveals that Smith cycled through more than 100 short-term jobs over a period of sixteen years, which Dr. Thompson described as

evidence of multiple adaptive impairments.[20]   Smith also
functioned very immaturely as an adult.  Long testified that
Smith got along well with the children of Beth Lewis,
Smith's fifth wife, because he related to them as a child rather
than as an adult: "[H]e was a lot mentality [*sic*] like they
were.  I mean, like instead of being a dad figure, he was kind
of like they were."   Gerald Lambright testified that, as an
adult, Smith was immature, had difficulty interacting with
adults his own age, would frequently mimic Donald Duck
when he spoke at all, and preferred to interact with children.[21]
Labrecque characterized Smith's emotional maturity as
resembling that of a twelve to fourteen year-old even a
number of years after he had committed the crimes.  Multiple
medical records appended to Smith's presentence report
describe Smith in his late teens and early twenties as
possessing an "immature personality" and exhibiting
"immature behavior."   As the *Grell III* court found, this
behavior indicates significant impairment in adaptive
behavior under Arizona law. *See id.* at 356–57 (stating that
tormenting other children, running away from home,
committing crimes, an inability to hold jobs, and immaturity
are among the elements of a mental history that "by itself,
provides strong evidence that [an individual] suffered a
'significant impairment' in the ability to 'meet[ ] the
standards of personal independence and social responsibility
expected' of him." (quoting Ariz. Rev. Stat. Ann. § 13-
753(K)(1), (3))).

---

[20] Dr. Martinez attributed Smith's inability to hold jobs in part to Smith's
impulsivity, itself an indicator of impaired adaptive behavior. *See Grell
III*, 291 P.3d at 353–55; *Atkins*, 536 U.S. at 318.

[21] The presentence report lists "Duck" and "Crazy Duck" as aliases for
Smith.

Additional evidence of Smith's impaired adaptive behavior not present in *Grell* makes Smith's impaired adaptive behavior even clearer. Charles McCarver, who lived in Smith's apartment complex and worked with Smith repossessing cars, gave testimony describing an incident in which McCarver's ex-girlfriend Penny jokingly told Smith that he could "have" their son because Smith and his wife were having difficulty conceiving their own child. Following this conversation, Smith called McCarver to say that Penny had told him he could have McCarver's son. McCarver adamantly refused. Undeterred, Smith showed up at McCarver's home expecting to take the boy, changing his mind only after seeing how happy the child was with McCarver. Smith's absurdly literal interpretation of McCarver's joke that he would "give" Smith his son vividly demonstrates Smith's malformed social and communication skills and his general inability to navigate his social world.[22]

---

[22] The record does not fairly support the state court's decision to discount Hight's testimony that Smith resembled her intellectually disabled sister on the sole ground that it was inconsistent with testimony by McCarver and a second lay witness, Sidney LeBlanc, who lived in Smith's apartment building and drove trucks for the same company as Smith. We credit Hight's testimony because, among these witnesses, only she had firsthand experience with someone diagnosed with intellectual disability. *See Grell*, 291 P.3d at 353; *Arellano*, 143 P.3d at 1020. More important, testimony by McCarver and LeBlanc does not contradict Hight's assessment of Smith as intellectually disabled. McCarver's testimony, as recounted above, *strongly reinforces* the conclusion that Smith was intellectually disabled. LeBlanc's explanation that he and Smith held a large number of short-term jobs as a result of their "footloose and fancy free" transient lifestyle, is at least as suggestive of traits indicating intellectual disability as of the standard of adaptive behavior expected of Smith's age and cultural group. Accordingly, we find the state court's determination that McCarver and LeBlanc were more credible witnesses than Hight is not fairly supported by the record.

Smith's mother, Sylvia Scott (Joe Lambright's wife), Gerald Lambright, and the presentence report all described Smith as a follower, a trait the Supreme Court has identified as an indicator of impaired adaptive behavior. Gerald said that Smith would do whatever Joe told him to do, adding that "it was almost like the guy could not think for himself." *See Atkins*, 536 U.S. at 318 ("in group settings [intellectually disabled people] are followers rather than leaders"). The presentence report describes Smith as having a "borderline personality," which is also probative of Smith's condition at the time of Smith's crime and trial.[23]

Moreover, Smith demonstrated a lifelong inability to make informed decisions regarding his own safety and welfare. Specifically, Smith was described as having poor judgment as a child and engaging in dangerous behavior without awareness of its risks. As an adult, Smith accepted dares to run across the highway in front of an oncoming truck and climb to the top of a radar tower hundreds of feet tall, where he dangled himself by his arms. He would sometimes

---

[23] Dr. Thompson testified that he found this assessment in the presentence report credible notwithstanding the lack of evidence regarding the author's level of training because, in his experience working with the Department of Corrections, the probation and parole officers who wrote such reports had experience with prisoners and diagnostic evaluations that provided them a reasonable basis from which to determine whether an individual has low or borderline cognitive functioning and because the report's findings are corroborated by substantial evidence of Smith's impaired mental functioning. We agree that the report constitutes probative lay witness testimony of Smith's disability. *See Arellano*, 143 P.3d at 1020. Accordingly, and in light of the foregoing discussion of the limitations of the Rule 11 reports, we find the state court's determination to afford the Rule 11 reports greater weight than the presentence report, and its critique of Dr. Thompson's contrary conclusion, lacks fair support in the record.

go up on the top of buildings where carpentry work was being performed and jump along the beams and rafters without any safety harness. On one occasion while in prison, Smith took a walk along the edge of the roof of a two-story building, earning a rebuke from Labrecque. Such reckless behavior, apparently undertaken without any comprehension of the risks involved, further demonstrates Smith's inability to meet the expected standards of personal independence.

Although Dr. Martinez viewed Smith's ability to date women as evidence of his adaptive abilities, that testimony is clearly of little worth. The only evidence of Smith's romantic life is his five failed marriages, the details of which paint a picture inconsistent with Dr. Martinez's assessment. Smith's first three marriages lasted a cumulative total of nineteen months. The presentence report notes that Smith beat his fourth wife, threatened her life, enjoyed tying her up and pretending to rape her, and on other occasions forced her to submit to anal intercourse against her will. Smith married Beth Lewis, his fifth wife, in November 1980, shortly before his arrest. According to Lewis, at one point she decided to end their relationship and Smith became very angry; he grabbed a gun and, shaking it in front of her, said "You want to end it? I can end it for us." Afraid for her life, Lewis said that she would "do anything." After contemplating this offer, Smith decided the pair should get married. That same evening, Smith pushed Lewis into the backseat of her car and tore off her pantyhose. Lewis said she began screaming and crying and begged Smith to stop, which he did, leading her to conclude that "[s]o he didn't actually I guess rape me." Following this encounter, Smith drove by Lewis's home on several occasions and waved a pistol at her; the couple married a short time later. We fail to see how Smith's serial marriages, at least some of which involved death threats as

well as incidents of simulated and actual sexual assault, exhibit the "standards of personal independence and social responsibility expected of the defendant's age and cultural group." Rather, they further demonstrate the adaptive impairments affecting this and so many other areas of Smith's childhood and adult life.

Testimony by Dr. Thompson and Dr. Martinez indicating that Smith possessed some adaptive skills does not alter the conclusion that it is highly probable that Smith experienced significant impairment in adaptive behavior at the relevant times. The evidence that Smith exhibited limited adaptive abilities is substantially outweighed by evidence of more far-reaching adaptive impairments. We note, moreover, that Arizona law does not mandate a complete absence of adaptive strengths. *See Grell III*, 291 P.3d at 357 ("The record also contains some indications of Grell's limited ability to adapt. Although this evidence makes our decision difficult, a diagnosis of mental retardation, as statutorily defined, does not require a complete absence of adaptive skills.").

Nor do we regard the Rule 11 reports as inconsistent with our conclusion. As the Supreme Court and our own Court have held, the ultimate conclusions stated in these reports—that Smith understood the difference between right and wrong, and was competent to stand trial—are not inconsistent with intellectual disability. *See Atkins*, 536 U.S. at 318 ("Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial."); *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 810 n. 3 (9th Cir. 2003) ("Incompetence and mental retardation are overlapping but distinct categories. Many retarded individuals are still competent to stand trial."), *abrogated on other grounds by Ryan v. Gonzales*, 133 S. Ct.

696 (2013). Nor, for that matter, is Dr. LaWall's finding that Smith had a personality disorder with antisocial features inconsistent with our conclusion regarding impaired adaptive behavior, especially in light of Smith's immaturity and childlike conduct. *See Grell III*, 291 P.3d at 354, 356 (citing expert testimony that "[i]f Grell had a mere conduct or personality disorder . . . he would have committed acts that were simply against the rules and deviant . . . , rather than acting, as he did, in ways that were embarrassing or immature," and noting that antisocial personality disorder is not inconsistent with intellectual disability); *Brumfield v. Cain*, 135 S. Ct. 2269, 2280 (2015) ("[A]n antisocial personality is not inconsistent . . . with intellectual disability.").

The vast majority of the evidence strongly points to the conclusion that Smith was unable to "meet[] the standards of personal independence and social responsibility expected of [his] age and cultural group," both before the age of eighteen and at the time of the crime. Ariz. Rev. Stat. Ann. § 13-703.02(K)(1). Accordingly, we conclude that the state court's determination that Smith's pre-arrest life did not show significant impairment in adaptive behavior is not fairly supported by the record.

In sum, we conclude that under § 2254(d)(8) the clear weight of the evidence overcomes the presumption of correctness attaching to the state court's finding that Smith was not intellectually disabled, as well as the state court's ancillary factual determinations necessary to its ultimate conclusions. Specifically, we have found that the grounds on which the state court discounted Dr. Thompson's testimony lack fair support in the record and are the product of legal error.

### 2. The State Court Applied an Unconstitutional Standard of Proof

The state court's factual determination is not entitled to deference for a separate and independent reason. The Pima County Superior Court found Smith was not intellectually disabled by applying an incorrect and unconstitutional legal standard, a question of law we review de novo.

As the Tenth Circuit has recognized in pre-AEDPA cases, a state court's factual determination rendered under a constitutionally impermissible legal standard is not entitled to a presumption of correctness. *See Lafferty v. Cook*, 949 F.2d 1546, 1551 n. 4 (10th Cir. 1991) ("The initial inquiry must be whether the Utah court made its fact findings under the correct legal standard of competency. It is elemental that fact finding made under an erroneous view of the governing law cannot be presumed correct. Only after concluding that a state court used the proper standard does a habeas court turn to the issue of the presumption of correctness."); *accord Walker v. Att'y Gen for Oklahoma*, 167 F.3d 1339, 1345 (10th Cir. 1999) ("Mr. Walker's competency was determined under a constitutionally impermissible standard of proof. Such a determination is not entitled to a presumption of correctness.").[24]

---

[24] The dissent in *Lafferty* contended that the majority erred by inserting an additional, preliminary step in its review of the state court's factual determination, contrary to the requirements of 28 U.S.C. § 2254(d). 949 F.2d at 1558–59 & nn. 2–3 (Brorby, J., dissenting). The majority is clearly correct. Because a factual determination rendered under an erroneously inflated and unconstitutional legal standard does not resolve the question of whether the same answer obtains under the correct lower standard, the factual determination rendered cannot be said to constitute

In the section of the Pima County Superior Court's decision entitled "Burden of Proof," the court described the legal standard governing Smith's *Atkins* claim.[25] The court subsequently analyzed the evidence, after which it set forth its ultimate finding in the final section of its opinion. It concluded that "the circumstances described at the hearing do not point to mental retardation *with any degree of certainty*." (Emphasis added.) A court's recitation of the proper governing legal standard does not insulate its holding from habeas review where the record demonstrates that the court actually applied an unconstitutional standard. *See Sears v. Upton*, 561 U.S. 945, 952 (2010) (per curiam) ("Although the court appears to have stated the proper prejudice standard, it did not correctly conceptualize how that standard applies to the circumstances of this case." (footnote omitted)). Here, because the state court made no other mention of the correct legal standard, and because its analysis provides no indication that the court actually applied the correct legal standard rather than the standard employed when it applied the law to the facts, its boilerplate statements in the introductory "Burden of Proof" section are of no force or effect.

---

a valid finding. Where a state court has made no valid finding, there is nothing to which a presumption of correctness may attach.

[25] In its introductory statement regarding the standard of review, the state court stated that Smith had the burden of proving his *Atkins* claim by clear and convincing evidence. It added that, due to the unique procedural posture of the case, it would also apply the preponderance of the evidence standard applicable to Rule 32 proceedings, and that its decision would be the same under that lower standard. The body of the opinion did not fulfill that promise, however, but, rather, the court concluded after reviewing all the evidence that it did not meet a "certainty" standard.

Under Arizona law, the "any degree of certainty" standard applied by the Pima County Superior Court is more akin to the "reasonable doubt" standard than the clear and convincing standard mandated by Arizona's *Atkins* statute, which requires only that the issue under consideration be "highly probable." *See State v. King*, 763 P.2d 239, 243, 246 (Ariz. 1988) (reversing trial court for providing erroneous jury instructions, and explaining that "[t]he instruction now before us utilized the term 'certainty' in defining the clear and convincing standard . . . . We believe that 'certainty' is truer to the concept of proof beyond a reasonable doubt than to the 'highly probable' meaning of the clear and convincing standard.").

To be sure, "[a] state's misapplication of its own laws does not provide a basis for granting a federal writ of habeas corpus." *Roberts v. Hartley*, 640 F.3d 1042, 1046 (9th Cir. 2011). A state's *Atkins* procedures present a special case, however. "'[B]ecause *Atkins* reserved for the states the task of developing appropriate ways to enforce the constitutional restriction' prohibiting the execution of the intellectually disabled, 'federal courts conducting habeas review routinely look to state law . . . in order to determine how *Atkins* applies to the specific case at hand.'" *Williams v. Mitchell*, 792 F.3d 606, 612 (6th Cir. 2015) (quoting *Black v. Bell*, 664 F.3d 81, 92 (6th Cir. 2011)). Stated differently, *Atkins* leaves to the states the task of developing appropriate procedures to enforce the constitutional right, but constitutionalizes the procedures the state creates. Consequently, where a state court analyzing an *Atkins* claim fails to follow binding state law, its decision does not simply violate state law, but also violates the Eighth Amendment right provided by *Atkins* and the violation is therefore cognizable by a federal habeas court. *Id.* ("[W]here a state-court decision is 'contrary to' clearly

established state supreme court precedent applying *Atkins*, the decision is 'contrary to *Atkins*' for purposes of habeas review" under AEDPA); *see also Black*, 664 F.3d at 97 ("[B]ecause *Atkins* defers to the individual states to set out the standard for a defendant to qualify as mentally retarded, the [state court's] misinterpretation of [the state supreme court's decision] is contrary to *Atkins*.").

Here, the "certainty" standard applied by the state trial court was plainly contrary to the clear and convincing standard required by Arizona's statute and adopted by its supreme court. *See* Ariz. Rev. Stat. Ann. § 13-703.02(G); *Grell II*, 135 P.3d at 701 ("The statute places on 'the defendant . . . the burden of proving mental retardation by clear and convincing evidence' in the pretrial hearing." (alteration in original) (quoting § 13-703.02(G))). Accordingly, the standard of proof applied by the state trial court was not simply contrary to state law but was also unconstitutional under *Atkins*, *see Williams*, 792 F.3d at 612; *Black*, 664 F.3d at 97, and, accordingly, the state court's findings are not due any deference. *See Lafferty*, 949 F.2d at 1551 n. 4; *Walker*, 167 F.3d at 1345.

There is another reason the standard of proof applied by the state trial court is unconstitutional, and would be even if it were consistent with state law: a "certainty" standard of proof transgresses the limits of the state's authority to craft appropriate procedures to enforce *Atkins* and, in so doing, encroaches on the substantive constitutional right. In reaching this conclusion, it is not necessary to determine what standard of proof the federal Constitution requires, but rather only whether the Arizona court applied a standard it forbids. *Cf. Schriro v. Smith*, 546 U.S. at 7–8 (state *Atkins* procedures may, "in their application, be subject to constitutional

challenge," but the state must first have an opportunity to apply them).

In *Atkins*, the Supreme Court did not announce a specific standard of proof governing claims of intellectual disability. Instead, the Court, citing *Ford v. Wainwright*, stated that it was "leav[ing] to the States the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 536 U.S. at 317 (quoting *Ford*, 477 U.S. at 405, 416–17). This did not leave the states unchecked discretion in determining such procedures, however. Rather, to be constitutional, a state's procedures must constitute "*appropriate* ways to *enforce* the constitutional restriction." *Id.* (emphases added) (quoting *Ford*, 477 U.S. at 416). The Court's citation to *Ford* reinforces this view. In *Ford*, a majority of the Court found Florida's specific procedures for determining the sanity of a condemned prisoner constitutionally inadequate. *See Ford*, 477 U.S. at 413; *see also id.* at 418 (plurality opinion); *id.* at 424–25 (Powell, J., concurring in part and concurring in the judgment); *id.* at 427 (O'Connor, J., concurring in the result in part and dissenting in part).

When the natural operation of a state's procedures for rendering factual determinations transgresses a substantive constitutional right, those procedures are unconstitutional. *See Bailey v. Alabama*, 219 U.S. 219, 239–44 (1911). It is elementary that the "natural operation" of applying a heightened standard of proof can determine the outcome of litigation, and thus the availability of a constitutional right. *See id.* at 244 (stating that "we must consider the natural operation of the statute here in question"). As the Supreme Court has recognized, it is often impossible to ascertain disputed facts with absolute certainty. *Victor v. Nebraska*,

511 U.S. 1, 14 (1994). Consequently, "the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions." *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring). "The function of a standard of proof . . . is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. at 370 (Harlan, J., concurring)). As a result, "[t]he standard [of proof] serves to allocate the risk of error between the litigants." *Addington*, 441 U.S. at 423; *see Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) ("The 'more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision.'" (quoting *Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 283 (1990))).

*Atkins* claims present a heightened risk of an erroneous factual conclusion. Unlike factual determinations in which the basic issue is whether a fact *occurred*—for example, whether a defendant actually committed the act of which he is accused—determinations like intellectual disability, which depend upon psychiatric diagnosis, turn on an expert's interpretation of the *meaning* of various facts. *Cf. Addington*, 441 U.S. at 429. As the Supreme Court explained in rejecting the argument that the Constitution requires use of a reasonable doubt standard in the context of civil commitment proceedings, the unique nature of psychiatric diagnosis renders factual determinations uniquely unsusceptible to certainty.

> The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt

standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical "impressions" drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient. Within the medical discipline, the traditional standard for "factfinding" is a "reasonable medical certainty." If a trained psychiatrist has difficulty with the categorical "beyond a reasonable doubt" standard, the untrained lay juror—or indeed even a trained judge—who is required to rely upon expert opinion could be forced by the criminal law standard of proof to reject commitment for many patients desperately in need of institutionalized psychiatric care.

. . .

We have concluded that the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment.

*Id.* at 430–32 (citations omitted). Similar concerns also arise in other contexts requiring psychiatric diagnosis. *See Ford*,

477 U.S. at 426 (Powell, J., concurring in part and concurring in the judgment) (sanity); *Cooper*, 517 U.S. at 365, 369 (competency).

The concern espoused in *Addington* regarding the inherent imprecision of psychiatric determinations of mental illness for the purpose of civil commitment applies with even greater force to psychiatric determinations of intellectual disability under *Atkins*.[26]    Unlike civil commitment proceedings, which inquire into whether an individual is presently mentally ill and poses a danger to himself or others, the age of onset element of *Atkins* claims requires a retrospective analysis of the individual's childhood capacity that may be years or, as in this case, even decades removed from the time of trial.  Moreover, in cases like this, in which the trial predates *Atkins* and Petitioner's claim arises for the first time on habeas, the determination of mental condition at the time of commission of the crime may occur not at trial but rather decades afterwards.   Smith's case illustrates the difficulties that inhere in such an inquiry: as discussed below, records detailing the administration of childhood IQ tests are unavailable, and lay witnesses untrained in psychology are asked to share distant recollections of Petitioner's behavior as a child and young adult.  Certainty is thus even less attainable

---

[26] It is of no consequence to the analysis that *Addington* and *Atkins* involve different *burdens of proof* than the case at bar, because the focus here is on the effect of the *standard of proof*.  Under *Addington*, a state desiring the civil commitment of an individual must demonstrate that he suffers from mental illness, whereas under *Atkins* an individual seeking to avoid execution by the state must demonstrate intellectual disability.  In both situations, the determination heavily relies upon psychiatric opinion, and thus in both situations a standard of proof requiring "any degree of certainty" as defined by Arizona law will often render it impossible for a party to carry its burden.  *See Addington*, 441 U.S. at 432.

and a certainty standard is even less constitutionally acceptable in such cases.

Further compounding the likelihood of error in *Atkins* claims is the fact that the overwhelming majority (85 percent) of individuals with intellectual disability fall into the "mild" category, for whom the likelihood of misdiagnosis is particularly acute. As young children such individuals are often indistinguishable from children without intellectual disability, and as adults they can acquire social and vocational skills adequate for minimum self-support. DSM-IV 43; *see also* AAIDD 11th ed., at 47 ("Individuals with [intellectual disability] typically demonstrate both strengths and limitations in adaptive behavior."). In fact, Daryl Atkins himself maintained that he was only "mildly mentally retarded." *Atkins*, 536 U.S. at 308. However, *Atkins* applies equally to *all* intellectually disabled individuals irrespective of the degree of their disability.

Not only are *Atkins* claims uniquely susceptible to erroneous factual determinations, but they occur in a context—capital punishment—requiring a heightened degree of certainty that the decision is not erroneous. "Because the standard of proof affects the comparative frequency of . . . erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each." *In re Winship*, 397 U.S. at 371 (Harlan, J., concurring). The Supreme Court's repeated holdings that capital cases require a heightened degree of certainty that the punishment is lawful make clear its determination that the social "disutility" of a wrongful execution outweighs the "disutility" of errors favoring defendants. *See Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[T]he Eighth Amendment

requires a greater degree of accuracy and factfinding than would be true in a noncapital case."); *Ford*, 477 U.S. at 411 (plurality opinion); *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (plurality opinion) ("[The] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. . . . When the choice is between life and death, [a heightened risk of wrongful execution created by a state statute] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). Accordingly, where, as in *Atkins*, the Eighth Amendment renders a class of individuals categorically ineligible for execution, the procedures used to determine whether a defendant falls into that class may not allocate nearly all of the risk of an erroneous determination to the defendant.

By requiring Smith to demonstrate with a "degree of certainty" that he is intellectually disabled, the Arizona court disregarded this fundamental rule. Simply stated, the court took the highly unusual step[27] of allocating nearly the entire risk of an erroneous determination to Smith. That the factual determination in question concerned an issue for which certainty may be unattainable, *cf. Addington*, 441 U.S. at 429–32, and a penalty for which a greater degree of reliability

---

[27] Only Georgia applies a more onerous standard, requiring proof of intellectual disability beyond a reasonable doubt. By contrast, every other state to establish a standard of proof imposes a more relaxed standard than the state court applied here. In addition to Arizona, only four states—Colorado, Delaware, Florida, and North Carolina—apply even a clearly convincing standard, and the remaining twenty-two states imposing the death penalty and the federal government apply a preponderance standard. *Hill v. Humphrey*, 662 F.3d 1335, 1365 n. 1 (11th Cir. 2011) (en banc) (Barkett, J., dissenting).

is required, *see, e.g., Gilmore*, 508 U.S. at 342; *Lockett*, 438 U.S. at 604–05 (1978) (plurality opinion), renders the constitutional violation even more clear. Like the Alabama statute in *Bailey*, the standard of proof applied by the Pima County Superior Court in this case transgresses a substantive constitutional right by accomplishing indirectly what the state may not do directly: the execution of individuals who are intellectually disabled under *Atkins*. *See Bailey*, 219 U.S. at 239 ("It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a [procedural rule] any more than it can be violated by direct enactment."); *Atkins*, 536 U.S. at 321. Because it impairs the substantive right, the state court's "certainty" standard of proof is not an "appropriate way[] to enforce the constitutional [protection]" mandated by *Atkins*. *Atkins*, 536 U.S. at 317. In short, the Constitution forbids requiring a defendant to demonstrate intellectually disability with "any degree of certainty."[28] Because the Pima County Superior Court made its finding that Smith is not intellectually disabled by applying an incorrect and unduly onerous legal standard, its ultimate factual determination is not consonant with the Eighth Amendment. A finding that is made pursuant to the wrong legal standard is not a finding at all. Accordingly, the state court's application of an unconstitutional standard of proof provides an independent and alternative ground for denying its determination a presumption of correctness.

---

[28] Because Smith satisfies the lower "clearly convincing" standard required by Arizona's *Atkins* statute, it can be assumed without deciding that the statutory standard is constitutional. However, many of the concerns expressed here apply to the clear and convincing standard as well.

## D. Whether Smith is Intellectually Disabled

Having determined that the state court's determination is not entitled to a presumption of correctness, we must review the record de novo to determine whether Smith has demonstrated intellectual disability by clear and convincing evidence, as required by Arizona law. For all the reasons set forth in Section II.C.1, we hold that he has. Considering Smith's intellectual functioning test scores and his history of significantly impaired adaptive behavior, as we must under *Atkins* and *Hall*, we find that the record in this case overwhelmingly demonstrates that Smith satisfied the two substantive prongs of Arizona's definition of intellectual disability both prior to age eighteen and at the time of the crime. Specifically, Smith's Otis test score of 62, combined with his poor academic performance, clearly demonstrates the childhood onset of his significantly subaverage general intellectual functioning. The record further demonstrates that, consistent with Dr. Thompson's testimony, Smith also experienced this condition at the time of the crime: improvement in Smith's intellectual functioning did not occur until after his incarceration in a structured environment, when he began receiving appropriate antidepressant medication as well as tutoring from Labrecque and Schad. The many parallels between Smith's life and that of the capital defendant in *Grell*, including Smith's stunted communication skills, lack of personal care skills, severe immaturity, and inability to maintain employment and personal relationships, reveal his significant impairment in adaptive behavior as a child and at the time of the crime, as does his general lifelong inability to navigate his social world.

There can be no doubt that the crime in this case was truly horrific. The Constitution, however, regards intellectually

disabled defendants as less morally culpable for their crimes, and for this reason prohibits their execution. *Atkins*, 536 U.S. at 316; *Hall*, 134 S. Ct. at 1992. Viewing the record as a whole, we find that Smith has demonstrated by clear and convincing evidence significantly subaverage general intellectual functioning existing concurrently with significant impairment in adaptive behavior, and that both conditions were manifested prior to age eighteen *and* at the time Smith committed the capital offense. The overwhelming weight of the evidence compels this result. Smith is intellectually disabled and may not be executed. *Atkins*, 536 U.S. at 316; *Hall*, 134 S. Ct. at 1992. Accordingly, we reverse Smith's death sentence and remand to the district court with instructions to grant the writ as to his capital sentence.

## CONCLUSION

The judgment of the district court is reversed. We remand with instructions to grant the writ with respect to the penalty phase and return the case to the state court to reduce Smith's sentence to life or natural life.

## REVERSED AND REMANDED.

SCHROEDER, Circuit Judge, concurring in the judgment and concurring in part:

I concur in all of Judge Reinhardt's opinion except Section II.C.2.

REINHARDT, Circuit Judge, specially concurring:

Obviously, I concur entirely in the majority opinion. I write this special concurrence only because I feel compelled to convey my serious concerns regarding the constitutionality of Arizona's *Atkins* statute. The issue before us is not limited to the case of Robert Smith. Rather, the constitutional infirmity of Arizona's statute creates a recurring problem with potentially far-reaching consequences: Arizona has executed 15 inmates since *Atkins*,[1] and 124 inmates remain on its death row, the eighth highest number of any state.[2] As detailed below, if presented with the issue, I would likely hold that in light of *Hall v. Florida*, 134 S. Ct. 1986 (2014), both substantive prongs of Arizona's intellectual disability statute—governing "intellectual functioning" and "adaptive behavior"—violate the Eighth Amendment because they permit the execution of individuals whom *Atkins* deems categorically ineligible for capital punishment.[3]

In *Atkins*, the Supreme Court cited the clinical definition for intellectual disability, but did not make clear that this

---

[1] Bureau of Justice Statistics, "Prisoners executed under civil authority in the United States, by year, region, and jurisdiction, 1977-2014" (Dec. 10, 2014).

[2] This figure is current as of July 1, 2015. *See* Death Penalty Information Center, *Death Row Inmates by State*, http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-death-row-year?scid=9&did=188#state (last visited Jan. 12, 2016).

[3] The third element of the Arizona statute requires that the onset of the intellectual functioning and adaptive behavior deficits occur before the age of eighteen. Ariz. Rev. Stat. Ann. § 13-703.02(K)(3) (2006); Ariz. Rev. Stat. Ann. § 13-753(K)(3) (2015). There is no reason to believe that this element is in itself unconstitutional.

definition was binding on the states. In *Hall*, however, the Court held that states must comply with elements of the clinical definition about which there exists a national consensus. Because both of Arizona's substantive prongs are more restrictive than the clinical definition, and because a national consensus exists with regard to the pertinent elements of the clinical definition, Arizona's statute is in all likelihood unconstitutional.

**A. The Supreme Court Embraces the Clinical Definition of Intellectual Disability**

In *Atkins v. Virginia*, 536 U.S. 304, 314–16, (2002), the Supreme Court identified a "national consensus" against executing the intellectually disabled, gleaned from its survey of states passing legislation exempting the intellectually disabled from the death penalty and the consistency of the direction of such legislative change. The Court defined "mental retardation" by citing two clinical definitions, one from the ninth edition of the American Association on Mental Retardation's (AAMR) *Mental Retardation: Definition, Classifications, and Systems of Support* (9th ed. 1992) [hereinafter AAMR 9th ed.], and a second from the fourth edition of the American Psychiatric Association's (APA) *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) [hereinafter DSM-IV]. *Id.* at 309 n. 3. The AAMR defines intellectual disability as characterized by two clinical elements: (1) "significantly subaverage intellectual functioning," (2) "existing concurrently with related limitations in . . . adaptive skill areas," which must "manifest [themselves] before age 18." AAMR 9th ed., *supra*, at 1. The DSM-IV similarly defines intellectual disability as consisting of (1) "significantly subaverage general intellectual functioning," (2) "accompanied by significant

limitations in adaptive functioning," where "[t]he onset . . . occurs[s] before age 18 years . . . ."  DSM-IV, *supra*, at 41. The Court noted that the states' "statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions" set forth by the AAMR and APA. *Atkins*, 536 US. at 317 n. 22.

*Atkins* did not expressly state whether it was establishing a substantive definition of intellectual disability as a matter of federal law.  The Court explained that "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded."  *Id.* at 317.  Citing *Ford v. Wainwright*, 477 U.S. 399 (1986), the Court explained that it "le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317 (quoting *Ford*, 477 U.S. at 405, 416–17) (first alteration added).  Because the cited sections of *Ford* address only procedural issues, and say nothing regarding the substantive definition of insanity, a straightforward reading of the Court's statement is that it leaves to the states the determination of *procedural* issues only.  Stated differently, under this reading of *Atkins*, the Court did not leave to the states the task of defining intellectual disability, but merely the task of determining *procedures* capable of use in identifying intellectually disabled persons.  Because a majority of the Court in *Ford* found Florida's specific *procedures* for determining the sanity of a condemned prisoner inadequate "to achieve even the minimal degree of reliability required for the protection of any constitutional interest," it is reasonable to conclude that a state's discretion in even this area is similarly circumscribed.  477 U.S. at 413; *see also id.* at 418 (plurality opinion); *id.* at 424–25 (Powell, J., concurring in part and

concurring in the judgment); *id.* at 427 (O'Connor, J., concurring in the result in part and dissenting in part).

Nevertheless, courts generally interpreted *Atkins* to mean that the Supreme Court did not establish a substantive definition of intellectual disability, and instead included the substantive definition of intellectual disability as among the tasks left to the states. *See Moorman v. Schriro*, 672 F.3d 644, 648 (9th Cir. 2012) ("The Supreme Court in *Atkins* did not define mental retardation as a matter of federal law."); *Williams v. Cahill ex rel. Cnty. of Pima*, 303 P.3d 532, 543 (Ariz. Ct. App. 2013) ("[E]very other state court that has addressed the issue has determined or implied that *Atkins* allows the states to define mental retardation without strict adherence to the clinical standards. Of the thirty-three states that still permit use of the death penalty, courts in twenty-three have stated or implied that *Atkins* did not define mental retardation, but instead left that task to individual states.").

In *Hall v. Florida*, 134 S. Ct. 1986 (2014), however, the Court held that, contrary to what the state courts and our own court had thought, *Atkins* set forth a substantive definition of intellectual disability encompassing those aspects of the clinical definition about which a national consensus exists. *See id.* at 1993 ("The question this case presents is how intellectual disability must be defined in order to implement these principles and the holding of *Atkins*."); *id.* at 1999 ("The clinical definitions of intellectual disability . . . were a fundamental premise of *Atkins*."); *see also Van Tran v. Colson*, 764 F.3d 594, 612 (6th Cir. 2014) ("In *Hall*, the Court reasoned that the Constitution requires the courts and legislatures to follow clinical practices in defining intellectual disability."). In *Hall*, the Court held unconstitutional

Florida's use of a strict IQ score cut-off of 70 without taking into account the test's margin of error, known as a "standard error of measurement" or "SEM," because this approach deviated from the clinical definition embraced in *Atkins*, and because a national consensus existed with regard to this aspect of the clinical definition. *Hall*, 134 S. Ct. at 2000; *see id.* at 1997–98 (finding a consensus against using a strict IQ score cut-off of 70 without considering the margin of error because such a practice is mandated by nine states at the most, and because all but one of the state legislatures to have considered the issue after *Atkins* and whose law has been interpreted by its courts have foregone use of a strict cut-off of 70).

The Court concluded that although Florida's statute appeared facially consistent with *Atkins*, the Florida Supreme Court had interpreted the provision more narrowly, rendering it inconsistent with *Atkins* and thus unconstitutional. *Id.* at 1994, 2000. Specifically, the Court stated that the Florida Supreme Court had held that an individual with an IQ score above 70 does not have an intellectual disability and is barred from presenting any other evidence to this effect, contrary to the medical community's views that IQ scores are inherently imprecise and should be considered in light of their margin of error. *Id.* at 1994–95. The Court explained that "IQ test scores should be read not as a single fixed number but as a range" taking into account the test's inherent imprecision, and that "an individual's score is best understood as a range of scores on either side of the recorded score." *Id.* at 1995. The Court thus held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 2001.

### 1. Arizona's Definition of Intellectual Functioning is Unconstitutional

While surveying other states' approach to assessing the intellectual functioning prong of intellectual disability, the *Hall* Court questioned the constitutionality of Arizona's method for determining IQ scores under *Atkins* but did not purport to decide the issue. *Id.* at 1996–97. The version of Arizona's statute in place at the time of Smith's evidentiary hearing, like the current version of the statute, includes a hard IQ cut-off score of 70, and precludes a defendant from presenting additional evidence of intellectual disability if all of his or her IQ test scores are above 70. Ariz. Rev. Stat. Ann. § 13-703.02(F) (2006); Ariz. Rev. Stat. Ann. § 13-753(F) (2015). However, Arizona's statute also instructs courts to "take into account the margin of error for the test administered." Ariz. Rev. Stat. Ann. § 13-703.02(K)(5) (2006); Ariz. Rev. Stat. Ann. § 13-753(K)(5) (2015). Thus, like Florida's statute, Arizona's statute appears constitutional on its face. However, as in *Hall*, Arizona's highest court has given the statute an unconstitutional construction. In *State v. Roque*, 141 P.3d 368, 402–03 (Ariz. 2006) (en banc), the Arizona Supreme Court rejected the defendant's contention that his test score be considered in light of the test's margin of error, explaining that "the [intellectual disability] statute accounts for margin of error by requiring multiple tests." This approach to accounting for the margin of error—using multiple tests without taking into consideration the margin of error for each test administered—is expressly foreclosed by *Hall*. Rather, under *Hall*, a state must apply the margin of error—meaning the range of scores likely to represent the subject's actual IQ—to every test administered. *See Hall*, 134 S. Ct. at 1995–96 ("Even when a person has taken multiple tests, each separate score must be assessed using the

SEM . . . . [B]ecause the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning."). Thus, as in *Hall*, the state's highest court has interpreted a facially constitutional statute to unconstitutionally exclude application of the SEM to each individual IQ test administered. Because Arizona's Supreme Court construes the statutory requirement to consider a test's margin of error in a manner directly contrary to that required by *Hall*, it renders unconstitutional the IQ provision of Arizona's statute—the intellectual functioning prong of intellectual disability.

## 2. Arizona's Definition of Adaptive Behavior is Unconstitutional

Although *Hall* did not address the second requirement for intellectual disability—limitations in adaptive behavior—its reasoning applies to this clinical element with equal force. Where states fail to abide by the clinical definition of "adaptive behavior" set forth in *Atkins* and adopted by a national consensus of states, they violate the Eighth Amendment just as they do in the case of intellectual functioning because they permit the execution of individuals whom *Atkins* deems ineligible for capital punishment. *Hall*, 134 S. Ct. at 2001. In short, under *Hall*, if a state defines adaptive behavior more narrowly than the clinical definition, and if the clinical definition has been adopted by a national consensus of states, that prong likewise runs afoul of the Eighth Amendment. Such is the case with Arizona's statutory definition of "adaptive behavior," as construed by its Supreme Court. The only difference is that here the constitutional violation is even clearer.

### a. A National Consensus Exists With Regard to the Clinical Definition

As in *Hall*, to determine whether a national consensus exists within the context of the Eighth Amendment, courts look to "'objective indicia of society's standards.'" *Id.* at 1996 (quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005)). To do so, we must consider the number of states that "implement the protections of *Atkins* by" following the clinical definition of adaptive behavior, *id.*, either expressly by statute or by judicial interpretation, *see Roper*, 543 U.S. at 564 (deeming as evidence of a national consensus those states prohibiting the juvenile death penalty "by express provision or judicial interpretation"), including in this figure those states that have abolished the death penalty, *see Hall*, 134 S. Ct. at 1997. As further evidence of a national consensus, courts also consider the direction and consistency of the change in how states have defined adaptive behavior since *Atkins* was decided. *See id.* at 1997–98. If a court determines that such a consensus exists, it proceeds to the next step and determines whether, in its independent judgment, a state's definition of adaptive behavior is constitutional or unconstitutional. *Id.* at 2000.

There exists a clear national consensus in favor of using the clinical definition of adaptive behavior. Only four states including Arizona define "adaptive behavior" in non-clinical terms.[4] A fifth appears to require no showing of impaired adaptive behavior at all, and in nine states the definition of adaptive behavior is unclear. Because nothing in the nine states' statutes or case law suggests that courts in those states

---

[4] A complete list of states referenced in this section and accompanying authorities is provided in Appendix A.

define adaptive behavior in non-clinical terms, the result is that only five, or at the very most fourteen, states can be said to permit the use of a non-clinical definition to analyze adaptive behavior under *Atkins*.

In contrast, thirty-six states prohibit use of a non-clinical definition of adaptive behavior in determining whether an individual is intellectually disabled under *Atkins*. These include the nineteen states that have abolished the death penalty, and one that has suspended its use. *See id.* at 1997 (counting among the national consensus those states that have abolished the death penalty, and one that has suspended its use). In addition, sixteen states expressly require use of the clinical definition, either by statute or by interpretation of the courts. *See Roper*, 534 U.S. at 564. The thirty-six states prohibiting use of a non-clinical definition of adaptive behavior far exceed the number of states the Supreme Court has required to establish a national consensus. *See Atkins*, 536 U.S. at 313–15 (30 states prohibit the death penalty for the intellectually disabled); *Roper*, 543 U.S. at 564 (30 states prohibit juvenile execution).

As in *Hall*, it is not simply the aggregate numbers that determine the existence of a national consensus but also the "[c]onsistency of the direction of the change." 134 S. Ct. at 1997–98 (comparing the number of states that since *Atkins* have passed legislation setting a strict IQ score cutoff at 70 with the number of states to either abolish the death penalty or pass legislation allowing defendants to present additional evidence of intellectual disability when their IQ test score is above 70 but within the margin of error). Since *Atkins* was decided, only one state has passed legislation defining adaptive behavior in non-clinical terms. During the same period, six states abolished the death penalty legislatively, a

court invalidated the death penalty in a seventh, and six other states passed legislation mandating use of the clinical definition, either as expressly stated in the state's statute or as interpreted by the courts. Since *Atkins*, "no state that previously [defined adaptive behavior in clinical terms] has modified its law" to mandate a non-clinical definition. *Id.* at 1998.

Having determined that a national consensus of states forbids use of a non-clinical definition, as indicated by the number of states taking this approach and the consistency of the direction of change, the final step in a court's inquiry is to apply its own independent judgment to the constitutionality of Arizona's definition of adaptive behavior. *See id.* at 1999–2000.

### b. Arizona's Definition is Narrower than the Clinical Definition

The two clinical definitions cited in *Atkins* and endorsed by a national consensus—the ninth edition of the AAMR and the DSM-IV—define impaired adaptive behavior as the existence of deficits in two or more skill areas among a list of ten or eleven total such areas.[5] *Atkins*, 536 U.S. at 309 n. 3.

---

[5] The ten adaptive skill areas enumerated in the ninth edition of the AAMR are communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. AAMR 9th ed., *supra*, at 1, 5, 38. The DSM-IV sets forth a nearly identical list of eleven skill areas, consisting of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. DSM-IV, *supra*, at 41. *See* John H. Blume et al., *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 691

These deficits in themselves have been clinically deemed sufficient to show the impairment of adaptive skills generally. Other measures may, from a clinical standpoint, be under or over-inclusive, but in any event they fail to meet the clinically recognized requirements of *Atkins* and *Hall*. Courts generally reach the adaptive behavior prong only in the case of individuals who demonstrate an IQ of 70 or below, a score limited to about 2.3% of the population. AAMR 9th ed., *supra*, at 37. When the individuals who meet the intellectual functioning prong are evaluated for impairment of adaptive skills under the *Atkins* clinical standards, only about 1% of the general population actually satisfies that standard and thus meets the clinical definition of intellectual disability. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 38 (5th ed. 2013) [hereinafter DSM-V]. In short, it is this 1% who are deemed to be intellectually disabled and thus under the constitution ineligible for the death penalty.

Arizona's means of determining impairment of adaptive behavior differs from the nationally agreed upon clinical definition even more substantially than does its IQ provision. Unlike the nationally approved clinical means of determining impaired adaptive behavior, which requires limitations in only a minority of established skill areas, Arizona assesses such limitations generally by examining on an overall basis "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." Ariz. Rev. Stat. Ann. § 13-703.02(K)(1) (2006); Ariz. Rev. Stat. Ann. § 13-753(K)(1) (2015).

_____

(2009) (describing the clinical criteria set forth in the AAMR and DSM-IV as "virtually identical").

Arizona courts interpret the state's statutory provision in a manner that is entirely different than that required by *Atkins* and *Hall*. *See State v. Grell*, 135 P.3d 696, 709 (Ariz. 2006); *accord State v. Boyston*, 298 P.3d 887, 895 (Ariz. 2013). In *Grell*, the defendant asserted that he had satisfied the adaptive behavior prong of Arizona's statute by demonstrating deficits in two of the eleven areas listed in the DSM-IV. *Grell*, 135 P.3d at 709. Rejecting Grell's claim that compliance with the DSM-IV, which *Hall* makes clear is the constitutionally required standard, satisfies the Arizona statute, the Arizona Supreme Court held that

> The defense claims to have clearly shown that Grell has deficits in two of the eleven areas listed in the DSM–IV and therefore has mental retardation. The DSM–IV definition of mental retardation, however, while similar in overall meaning, is not the same as the [Arizona] statutory definition. The statute requires an *overall assessment* of the defendant's ability to meet society's expectations of him. It does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas.

135 P.3d at 709 (citation omitted) (emphasis added). Construing the Arizona statute, the *Grell* Court then found that the defendant had failed to demonstrate a significant impairment in adaptive behavior. *Id.*

Thus, as construed by the Arizona courts, Arizona's means of determining impairment of adaptive behavior is not simply different than the clinical means required by *Hall*: it

specifically rejects the Supreme Court's clinically based substantive standard; it is substantially more restrictive than the constitutionally required standard; and, it fails to cover numerous individuals deemed to be suffering from impaired adaptive behavior under the Constitution. *Williams*, 303 P.3d at 548 (Eckerstrom, P.J., dissenting) ("Arizona's [adaptive behavior] statutory requirements substantially narrow the class of persons who are defined as mentally retarded when compared with the class of those who would be clinically defined as such"). This is because, unlike the nationally approved clinical standard, which requires deficits only in a minimal number of adaptive skill areas, Arizona's definition, as interpreted by Arizona state courts, requires that impairments be considered globally and determined on an overall basis, regardless of the specific limitations that compel an individual's classification as adaptively impaired under the constitutionally required clinical standard.

Arizona's standard departs from the clinical standard in two fundamental ways. First, it requires deficits in both of two general areas: social responsibility and personal independence. By contrast, an individual evaluated under the clinical definition need not manifest deficits in both of these or any other general areas, so long as he demonstrates deficits in at least two of a number of skill areas. Thus, individuals who demonstrate "significant limitations in . . . adaptive behavior" under the AAMR or DSM-IV standards based on factors other than overall social responsibility and personal independence (which are not discreet skill areas under either standard) will fail to satisfy Arizona's less inclusive standard. The Arizona standard ignores the heterogeneous nature of adaptive behavior and imposes a one-size-fits-all definition that excludes many individuals falling under the clinical definition. *See* AAMR 9th ed. 13 ("[T]here is no one way

that defines 'retarded' performance. Every person with
mental retardation will differ in the nature, extent, and
severity of their functional limitations . . . . The current
definition reflects this fact by requiring the presence of
limitations in two or more of a variety of adaptive skill areas
but does not require any one single limitation or any specific
combination of limitations.").

The second way in which Arizona's standard diverges
from the clinical definition is that it, unlike the clinical
definition, includes an "overall assessment of the defendant's
ability to meet society's expectations of him." *Grell*,
135 P.3d at 709. This means that a court may conclude that
even an individual demonstrating adaptive deficits in the
required areas of personal independence and social
responsibility nevertheless does not meet the adaptive
behavior prong under the Arizona statute because he has
adaptive strengths in certain areas that outweigh adaptive
deficits in others. This distinction is critical, because the
clinical definition recognizes that adaptive weaknesses may
coexist alongside adaptive strengths, and requires that
adaptive skills be assessed independently of each other to
prevent strengths in certain areas from outweighing
weaknesses in others. *See* AAMR 9th ed. 6 ("Specific
adaptive limitations often coexist with strengths in other
adaptive skills or other personal capabilities"); *id.* at 7 ("[A]n
individual may have a strength in a particular adaptive skill
area (e.g., social skills) while having difficulty in another
skill area (e.g. communication); and . . . an individual may
possess certain strengths within a particular specific adaptive
skill, while at the same time having limitations within the
same area (e.g., functional math and functional reading,
respectively)."). Because Arizona's statutory definition of
impaired adaptive behavior, as defined by its courts, is under-

inclusive and would not cover numerous individuals who would be deemed to suffer from impaired adaptive behavior under the nationally recognized clinical definition, I believe that the Arizona statute, when properly before a federal court, will in all likelihood be held to be unconstitutional.

Although the professional manuals cited in *Atkins* are no longer the most current versions, the same conclusion is equally likely with respect to the more recent editions. Although *Atkins* cites the 9th edition of the AAMR and the DSM-IV, *see* 536 U.S. at 308 n. 3, *Hall* cites the DSM-V and the eleventh definition of the American Association of Intellectual and Developmental Disabilities (AAIDD) (formerly the AAMR) (11th ed. 2010), *see* 134 S. Ct. at 1994, 1995, 2000, 2001. Each of the editions cited in *Hall* retains the essential premise and characteristic of the clinical definition cited in *Atkins* and rejected by the Arizona Supreme Court: an individual must demonstrate deficits in only a number of skill areas among a larger list, deficits are not required in any specific listed categories, and adaptive deficits in certain categories are sufficient and need not be balanced against or outweighed by strengths in other areas.[6] *See Williams*, 303 P.3d at 547 n. 12 (Eckerstrom, P.J., dissenting) ("[T]he revised AAIDD definition [of adaptive behavior] is not a meaningful departure from either the DSM–IV criteria or the AAMR's prior definitional standard set forth in *Atkins*."); *Chase v. State*, 171 So. 3d 463, 471 (Miss. 2015) ("The [AAIDD and DSM-V definitions of intellectual disability] have not materially altered the diagnosis of intellectual disability [cited in *Atkins*] but have provided new terminology."); *United States v. Williams*,

---

[6] The relevant portions of each professional manual's definition of adaptive behavior are set forth in Appendix B.

1 F.Supp.3d 1124, 1146–47 (D. Hawaii 2014).     Most important, the Arizona Court of Appeals strongly questioned *Atkins* and expressly rejected the more recent version of the clinical elements, holding that Arizona is not bound by the AAIDD's clinical guidelines because, under *Grell*, Arizona's definition of adaptive behavior differs from the clinical definition. *Williams*, 303 P.3d at 541.

As the foregoing discussion demonstrates, the Arizona court denied Smith's *Atkins* claim by applying a likely unconstitutional statute.      An example of how that unconstitutional statute works in practical effect is that with respect to Smith, the Arizona court made no assessment as to whether he met any two of the specific ten or eleven elements listed in *Atkins* or any of the three domains or elements referred to in *Hall* but instead relied on the state's "overall assessment of [his] ability to meet society's expectations of him" which the Arizona Supreme Court found to be the requirement prescribed in the Arizona statute. This is directly contrary to the substantive clinical standard required by *Atkins* and *Hall*. Finally, in this respect, it appears evident that, properly assessed, Smith qualifies as intellectually disabled under both the initial and updated medical standards.

As in this case, the right announced in *Atkins* may be all that stands between an intellectually disabled defendant and an unconstitutional execution. However, Arizona's statutory scheme, as interpreted by its courts, severely erodes that right. Given the gravity of this issue and the likelihood that it will arise in future cases, the Arizona legislature would do well to amend its statutory scheme to bring it within the boundaries of the Eighth Amendment.

## Appendix A

**I.  States that retain the death penalty and define "adaptive behavior" in non-clinical terms.**

|   | State | Citation |
|---|-------|----------|
| 1 | Arizona | Ariz. Rev. Stat. Ann. § 13–753(F); *State v. Grell*, 135 P.3d 696, 709 (Ariz. 2006). |
| 2 | Texas | Tex. Health & Safety Code § 591.003(1); *Ex parte Briseno*, 135 S.W.3d 1, 8–9 (Tex. Crim. App. 2004). |
| 3 | Utah | Utah Code Ann § 77–15a–102. |
| 4 | Washington | Wash. Rev. Code § 10.95.030(2)(d). |

**II.  States that retain the death penalty but which do not require any showing of impaired adaptive behavior.**

|   | State | Citation |
|---|-------|----------|
| 1 | Kansas | Kan. Stat. Ann. §§ 21-6622(h), 76-12b01(i); *State v. Maestas*, 298 Kan. 765, 783 (Kan. 2014). |

**III.**     **States that retain the death penalty in which the definition of "adaptive behavior" is unclear.**

|   | State | Citation |
|---|-------|----------|
| 1 | Colorado | Colo. Rev. Stat. Ann. § 18-1.3-1101(2). |
| 2 | Georgia | Ga. Code Ann. § 17-7-131(a)(3). |
| 3 | Indiana | Ind. Code § 35-36-9-2; *Pruitt v. State*, 834 N.E.2d 90, 108 (Ind. 2005). |
| 4 | Louisiana | La. Code Crim. Proc. Ann., art. 905.5.1(H)(1)(b). |
| 5 | Montana | Montana has no *Atkins* statute and no cases defining adaptive behavior. |
| 6 | New Hampshire | New Hampshire has no *Atkins* statute and no cases defining adaptive behavior. |
| 7 | South Carolina | S.C. Code Ann. § 16-3-20(C)(b)(10); *Franklin v. Maynard*, 588 S.E.2d 604, 605–06 (S.C. 2003). |
| 8 | South Dakota | SDCL § 23A-27A-26.2. |
| 9 | Wyoming | Wyo. Stat. Ann. § 7-11-301(a)(iii). |

Kansas, New Hampshire, and Wyoming have not carried out any executions in decades.[7]  Colorado has carried out only one execution since 1977, and Montana and South Dakota have each carried out three;[8] however, none of these cases appears to have involved a claim raising the *Atkins-Hall* issue.  These states' definitions thus deserve little weight. *See Hall*, 134 S. Ct. at 1997; *Atkins*, 536 U.S. at 316.

## IV.     States that have abolished the death penalty.[9]

1.  Alaska
2.  Connecticut
3.  Hawaii
4.  Iowa
5.  Illinois
6.  Massachusetts
7.  Maryland
8.  Maine
9.  Michigan
10. Minnesota
11. Nebraska
12. North Dakota
13. New Jersey
14. New Mexico
15. New York
16. Rhode Island

---

[7]   Death  Penalty  Information  Center, http://www.deathpenaltyinfo.org/node/5741 (last visited July 31, 2015).

[8] *Id.*

[9] Death Penalty Information Center, *States With and Without the Death Penalty*,  http://www.deathpenaltyinfo.org/states-and-without-death-penalty (last visited July 20, 2015).

17. Vermont
18. Wisconsin
19. West Virginia

In addition, Oregon has suspended its death penalty and has executed only two individuals in the past 40 years. *Hall*, 134 S. Ct. at 1997. Oregon does not define "adaptive behavior" by statute and Oregon courts have not considered the issue.

## V. States that retain the death penalty but utilize the clinical definition of "adaptive behavior."

|   | State | Citation |
|---|-------|----------|
| 1 | Alabama | *Lane v. State*, No. CR-10-1343, 2013 WL 5966905, at *5 (Ala. Crim. App. 2013). |
| 2 | Arkansas | *Jackson v. Norris*, 615 F.3d 959, 961–62 (8th Cir. 2010). |
| 3 | California | *In re Hawthorne*, 35 Cal.4th 40, 47–48 (Cal. 2005); *Campbell v. Superior Court*, 159 Cal. App. 4th 635, 641 (Cal. Ct. App. 2008). |
| 4 | Delaware | Del. Code Ann. Tit. 11 § 4209(d)(3)(d)(1). |
| 5 | Florida | *Hodges v. State*, 55 So.3d 515, 534 (Fla. 2010). |
| 6 | Idaho | Idaho Code Ann. § 19-2515A(1)(A). |

| 7 | Kentucky | *Bowling v. Commonwealth*, 163 S.W.3d 361, 369–70 & n. 8 (Ky. 2008). |
| 8 | Missouri | Mo. Ann. Stat. § 565.030(6). |
| 9 | Mississippi | *Chase v. State*, No. 2013-CA-01089-SCT, 2015 WL 1848126, at *1–6 (Miss. 2015). |
| 10 | North Carolina | N.C. Gen. Stat. Ann. § 15A-2005(a)(1)b. |
| 11 | Nevada | *Ybarra v. State*, 247 P.3d 269, 273-74 & n. 6 (Nev. 2011). |
| 12 | Ohio | *State v. Lott*, 97 Ohio St.3d 303, 305 (Ohio 2002). |
| 13 | Oklahoma | Okla. Stat. Ann. tit. 21 § 701.10b(A). |
| 14 | Pennsylvania | *Commonwealth v. Hackett*, 99 A.3d 11, 27 (Pa. 2014). |
| 15 | Tennessee | *State v. Pruitt*, 415 S.W.3d 180, 203-04 (Tenn. 2013). |
| 16 | Virginia | Va. Code Ann. § 19.2–264.3:1.1(A); *Walker v. Kelly*, 593 F.3d 319, 323 & n.2 (4th Cir. 2010). |

**VI.**      **States that have passed legislation since *Atkins* defining adaptive behavior in non-clinical terms.**

|   | State | Citation |
|---|-------|----------|
| 1 | Utah | Utah Code Ann. § 77–15a–102 (West 2003). |

**VII.**     **States that have abolished the death penalty since *Atkins*.**

|   | State | Citation |
|---|-------|----------|
| 1 | Connecticut | 2012 Conn. Pub. Acts no. 12–5. |
| 2 | Illinois | 725 Ill. Comp. Stat. Ann. 5/119-1 (West 2011). |
| 3 | Maryland | Md. Code Ann.  Correc. Servs. §§ 3–901 et seq. (Lexis 2008). |
| 4 | Nebraska | Neb. Laws. L.B. 268 (2015). |
| 5 | New Jersey | N.J. Stat. Ann. § 2C:11–3(b)(1) (West Supp. 2007). |
| 6 | New Mexico | N.M. Stat. § 31-18-14 (2009). |

The New York Court of Appeals invalidated New York's death penalty under the State Constitution in 2004. *People v. LaValle*, 817 N.E. 2d 341 (N.Y. Ct. 2004).  The legislature has not voted to reinstate it.

**VIII.  States that have passed legislation since *Atkins* mandating use of the clinical definition of adaptive behavior.**

|   | State | Citation |
|---|-------|----------|
| 1 | California | Cal. Penal Code Ann. § 1376(a) (West Supp. 2003); *In re Hawthorne*, 35 Cal.4th 40, 47–48 (Cal. 2005). |
| 2 | Delaware | Del. Code Ann. tit. 11 § 4209(d)(3)(d)(1) (2002). |
| 3 | Idaho | Idaho Code Ann. § 19-2515A(1)(A) (2003). |
| 4 | Nevada | Nev. Rev. Stat. § 174.098.7 (2003); *Ybarra v. State*, 247 P.3d 269, 273-74 (Nev. 2011). |
| 5 | Oklahoma | Okla. Stat. Ann. § 701.10b(A) (2006). |
| 6 | Virginia | Va. Code Ann. § 19.2–264.3:1.1(A) (2003); *Walker v. Kelly*, 593 F.3d 319, 323 & n.2 (4th Cir. 2010). |

In 2014, Louisiana amended a 2003 statute that had been judicially construed as adopting the clinical definition, and codified a new definition that uses clinical language from the DSM-V but which has not yet been construed by courts. *See* La. Code Crim. Proc. Ann. Art. 905.5.1(H)(1) (2003) (amended 2009, 2014); *State v. Williams*, 22 So.3d 867, 880–81 & n. 10 (La. 2009); *Brumsfield v. Cain*, 744 F.3d 918, 924 (5th Cir. 2014), *overruled on other grounds* (citing *State*

*v. Dunn*, 41 So.3d 454, 459 (La. 2010)); La. Code Crim. Proc. Ann. Art. 905.5.1(H)(1)(b) (2014).

**Appendix B**

| Manual | Definition of Intellectual Disability | Measurement | Definition of Adaptive Skills |
|---|---|---|---|
| AAMR 9th ed. | "Substantial limitations in present functioning. . . . characterized by [1] significantly subaverage intellectual functioning, [2] existing concurrently with related limitations . . . adaptive skill areas"[1] | "limitations in two or more of the following applicable adaptive skill areas"[2] | "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work."[3] |
| AAMR 10th ed. | "characterized by [1] significant limitations both in intellectual functioning and [2] in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."[4] | "performance that is at least two standard deviations below the mean of either (a) *one of the* following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills."[5] | "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives." <br>• *Conceptual skills:* "Language (receptive and expressive), Reading and writing, Money concepts, Self-direction" <br>• *Social skills:* "Interpersonal, Responsibility, Self-esteem, Gullibility (likelihood of being tricked or manipulated), Naiveté, Follows rules, Obeys laws, Avoids victimization" <br>• *Practical skills:* "Activities of daily living (eating, transfer/mobility, toileting, dressing), Instrumental activities of daily living (meal preparation, housekeeping, transportation, taking medication, money management, telephone use), Occupational skills, Maintains safe environments"[6] |

| Manual | Definition of Intellectual Disability | Measurement | Definition of Adaptive Skills |
|---|---|---|---|
| AAIDD 11th ed. | "characterized by [1] significant limitations in both intellectual functioning and [2] in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."[7] | "performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills."[8] | "the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives." <br>• Conceptual skills: "language; reading and writing; and money, time and number concepts" <br>• Social skills: interpersonal skills, social responsibility, self-esteem, gullibility, naiveteé (i.e. wariness), follows rules/obeys laws, avoids being victimized, and social problem solving <br>• Practical skills: activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone"[9] |
| DSM-IV | "[1] significantly subaverage general intellectual functioning . . . that is accompanied by [2] significant limitations in adaptive functioning"[10] | "significant limitations in adaptive functioning in at least two of the following skill areas"[11] | "communications, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety"[12] |

| Manual | Definition of Intellectual Disability | Measurement | Definition of Adaptive Skills |
|---|---|---|---|
| DSM-V | "a disorder . . . that includes both [1] intellectual and [2] adaptive functioning deficits in conceptual, social, and practical domains." | "at least *one* domain of adaptive functioning–conceptual, social or practical–is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more] life settings at school, at work, at home, or in the community."[13] | "Without ongoing support, the adaptive deficits limit functioning in *one* or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community."<br><br>Adaptive functioning deficits result in a "failure to meet developmental and socio-cultural standards for personal independence and social responsibility."[14]<br><br>"Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical."<br>• *Conceptual domain*: competence in memory language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others."<br>• *Social domain*: "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others."<br>• *Practical domain*: learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others."[15] |

1. AAMR 9th ed., at 1, 5.

2. *Id.*

3. *Id.* at 5, 38.

4. AAMR 10th ed., at 39.

5. *Id.* at 13, 14.

6. *Id.* at 14, 42, 198.

7. AAIDD 11th ed., at 221.

8. *Id.* at 43.

9. *Id.* at 217, 218, 222, 224.

10. DSM-IV, at 41.

11. *Id.*

12. *Id.*

13. *Id.* at 38.

14. DSM-V, at 33.

15. *Id.* at 33, 37.

CALLAHAN, Circuit Judge, dissenting:

The one thing everyone appears to agree on is that Smith is not intellectually disabled.[1] When tested in 2005 the experts found that he had an IQ of between 87 and 93, well within the low-average to average range of intellectual ability. Yet despite this fact, the majority reverses because it is certain that Smith was intellectually disabled in 1980 when he murdered Sandy Owen. The majority reaches this conclusion by disregarding the findings of the state courts, denying those courts the deference they are due, and expressing supreme confidence in its own ability to detect past intellectual disability despite substantial conflicting evidence and the fact that Smith is not now intellectually disabled. Accordingly, I dissent.

The majority recognizes that although Smith filed his federal habeas petition prior to the effective date Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the state court factual findings are entitled to a presumption of correctness.[2] Nonetheless, the majority

---

[1] As does the majority opinion, I use the term "intellectually disabled" rather than "mentally retarded" except where the term is used in quoted material.

[2] Under pre-AEDPA law:

> We review the district court's decision to grant habeas relief de novo. We review de novo questions of law and mixed questions of law and fact, whether decided by the district court or the state courts. The district court's factual findings are reviewed for clear error. We therefore accept its findings "absent a definite and firm conviction that a mistake has been committed." State court factual findings are entitled to a presumption of

concludes that the state court's factual determination is "not fairly supported by the record." Op. 11. The majority is wrong as an objective review of the record discloses ample evidence to support the Arizona courts' determination that Smith did not sustain his burden of showing that he was intellectually disabled in 1980.

Section II C 2 of Judge Reinhardt's "opinion" also contains his view—for which there is no concurrence—that the Arizona courts applied an "unconstitutional standard of proof." This argument is based on an unreasonable reading of the trial court's decision and a failure to give the state courts' decisions the deference they are due. Judge Reinhardt's opposition to the death penalty in Section 2 C of his opinion is neither the ruling of this panel nor of the Ninth Circuit.

## I. The Record Adequately Supports the Determination that Smith Failed to Show He Was Intellectually Disabled at the Time of the Murder and His Conviction.

The majority boldly asserts that the finding that Smith has not shown that he was intellectually disabled at the time of the murder and his trial is not fairly supported by evidence. Op. 11. The majority recognizes, as it must, that there was conflicting evidence, but argues that "once we look behind each expert's conclusion and consider the evidence on which

---

correctness, subject to eight exceptions enumerated in the previous version of 28 U.S.C. § 2254(d).

*Sivak v. Hardison*, 658 F.3d 898, 905–06 (9th Cir. 2011) (internal citations omitted).

he relies," the majority of the evidence supports a finding of intellectual disability. Op. 12 n. 7. This is not a fair reading of the record.

## A. The Record

### 1. *The Underlying Crime and Prior Judicial Proceedings*

In our 1999 en banc opinion affirming the denial of Smith's first federal habeas appeal, we described the crime as follows:

> Lambright and Smith were traveling across the country with Lambright's girlfriend, Kathy Foreman. Smith was troubled by the fact that while Lambright and Foreman had intercourse in his presence, he did not have anybody along to satisfy him. For his part, Lambright thought that he "would like to kill somebody just to see if he could do it." [*State v. Lambright*], 138 Ariz. [63,] 66 [(1983)] . . . . They decided that both desires could be fulfilled, and they set out with Foreman to find a victim. They found Sandy Owen and kidnaped her. Smith raped her on the way to a mountain site where they all got out of the car and Smith raped Owen again as Lambright and Foreman had intercourse. What happened next was that Smith began choking Owen, and Lambright declared that she must be killed. So, "Lambright took Foreman's knife out of its sheath and began stabbing the victim in the chest and abdomen, twisting the knife around inside of her. Smith held one of the victim's

arms while she was being stabbed, and Foreman held the other arm." *Id*. at 67. . . . After that, "Smith unsuccessfully tried to break Ms. Owen's neck by twisting her head. Then Lambright, Foreman or both began cutting deeply into the victim's neck with the knife. . . . The victim remained alive, and was at least semiconscious, as she attempted to raise herself up on one arm. Lambright picked up a large rock and hurled it at her head. Foreman testified that as he threw the rock he yelled 'Die, bitch.'" *Id*. The three then drove off in a celebratory mood, playing the piece "We Are the Champions" as they went. *See id*. Once caught, the trio's song changed. Foreman turned state's evidence, was given immunity, and testified against her erstwhile lover and his friend. Lambright confessed, but deemed Smith to be the worst of the three. Smith, too, confessed, but he dubbed Foreman and Lambright as the real killers.

In 1982, an Arizona jury convicted Robert Douglas Smith of first-degree murder, kidnaping, and sexual assault. *Schriro v. Smith*, 546 U.S. 6 (2005). He was given the death penalty.

Smith's appeals and post-conviction proceedings proved unavailing. *See Stewart v. Smith*, 536 U.S. 856 (2002). It was not until after the Supreme Court had denied him relief, that around 2004 Smith alleged for the first time that he was intellectually disabled and thus pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), could not be executed. *See Schriro v. Smith*, 546 U.S. 6 (2005). In December 2005, we entered an

order suspending Smith's federal proceedings and directing his counsel "to pursue state proceedings in Arizona to determine whether the state is prohibited from executing the petitioner in accordance with *Atkins*." *Smith v. Schriro*, No. 96-99025 (Dec. 12, 2005). The Arizona Superior Court, Pima County, held extensive proceedings concerning Smith's intellectual disability before issuing its opinion on March 27, 2008.

2. *The Evidence Concerning Intellectual Disability*

In 1964, when Smith was 15, he took the Otis IQ test and received scores of 62 and 71. The state court found that the "Otis test was developed in approximately the 1920's and was outmoded at the time it was reportedly given to [Smith] in 1964." More importantly, "[t]here is no evidence concerning the qualifications of the persons administering the tests, whether an appropriate protocol was followed, the specific circumstances of [Smith] at the times of the tests, or any of the other information required to determine the validity of these school record entries."

Moreover, by this time, Smith's dysfunctional and abusive childhood had already had an effect on his education. At age 15 he scored in the 2nd to 5th percentiles on the Stanford Achievement Test, placing him seven years below his age level. Moreover, his school transcripts reveal that he received nearly all "Ds" and "Fs" in his academic studies. Indeed, Smith dropped out of school when he was 16.

Between the time he left school at the age of 16, and his arrest some 15 years later in 1980, Smith had many jobs, a number of unstable relationships, and frequent changes of residence. The state court found that those who knew Smith

stated that "he was one of a group of young men which included his co-defendant, Joe Lambert, Sidney LeBalanc and Charles McCarver, who lived together, worked together, and traveled together at various times during the 1970's." The state court found that the evidence from the 1970's showed that Smith was a full participant in his adult life. It found that Smith:

> worked as a diesel mechanic, garage mechanic, car repossessor, truck driver, cable installer and apartment maintenance provider, among other things. While Defendant held a large number of jobs, he was consistently employed. Defendant's last employer indicated, in a form attached to Defendant's pre-sentence report, that Defendant worked for approximately four months as a mechanic employed to maintain and repair equipment, that he received a raise after three months, that his work was rated "satisfactory" for job performance, work skills and attendance, and "excellent" for cooperation with employer/supervisor and other employees, and that he would be considered for re-employment.

Smith's friend, LeBlanc, who sometimes worked for the same employer as Smith, stated that Smith had difficulties with paperwork and written tests, as opposed to hands-on or mechanical tasks. Similarly, Robert Lebrecque, a former maintenance man with the Arizona Department of Corrections, who worked with Smith for about eight years after he began serving his prison term, commented that although Smith "was a little slow at the beginning . . . [i]f I

showed him how to do something, I only had to show him once." Lebrecque recalled that Smith could read, "but seemed to have a hard time understanding what the written words meant."[3]

Smith was married five times in approximately 15 years. The state court, however, noted that while Smith "made poor choices in partners and had great difficultly maintaining relationships with women, this fact can be explained as arising from his loveless childhood just as well as it can be viewed as an indicator of the limitations of mental retardation." Smith's last marriage, which was entered into between the time of the offense and his arrest, "showed promise of being quite different from the others despite two incidents of violence in the relationship." His fifth wife had known Smith since childhood. During this marriage Smith worked as a truck driver and performed dry-wall and other work in the apartment complex. His wife did not work outside the home and Smith supported her and her three children, for whom he was a loved, active father figure.

After he was arrested, the pre-sentence report characterized Smith as having a "borderline mentality." The state court, however, gave this description little weight because the "experience of this probation officer is unknown, and there was no indication that he had training as a psychologist or other mental health professional that would

---

[3] Lebrecque further noted that because of Smith's "lack of basic grade-school academic skills, and his short stature, Lebrecque initially thought his maturity level was that of a 12 to 14 year old."

provide the expertise required for any diagnostic observations."[4]

---

[4] The state court further explained:

> The pre-sentence report contains detailed descriptions of the offense, including a recitation of information obtained from written statements of Defendant to the court and his statements to law enforcement officers. Information concerning Defendant's social, marital, educational, religious, and employment history, was also apparently obtained primarily from Defendant. The pre-sentence report does not mention any difficulty in obtaining this information from Defendant. The section entitled "Physical and Mental Health," while noting Defendant's depression, "very poor self concept," sexual issues, drug abuse and early psychiatric treatment, did not mention mental retardation. The references to retardation were two. In the "education" section, the pre-sentence report writer stated: "Appended records indicate that intelligence tests administered during his eighth grade year revealed an IQ of 71, indicating that he is borderline but educable." The "Evaluation Summary" includes the following sentence: "His borderline mentality probably makes him an easy person to manipulate and somewhat of a follower in social situations." Defendant's so-called "borderline mentality" is not mentioned as a mitigating circumstance - - in fact, the pre-sentence report noted that, "In view of the defendant's known history and the circumstances of the instant offense, the Court may feel that there are no applicable mitigating circumstances." It is at least as likely that the "borderline" language in the Evaluation Summary section simply reflected the pre-sentence report writer's knowledge of the 1964 IQ test referenced in the school records, as that the pre-sentence report writer based the comment on an analysis of Defendant's history and characteristics grounded in the appropriate expertise. There simply is no way to know.

In addition, two mental health professionals, Dr. Martin Levy and Dr. John LaWall, performed Rule 11 evaluations of Smith in 1982 for purposes of his criminal trial proceedings. Both found Smith to be competent. Dr. Levy noted that Smith was neatly dressed and displayed logical, coherent thought.[5] Dr. LaWall also noted that Smith "was neat and cooperative, and his mood somewhat depressed, with somewhat blunted affect." Dr. LaWall's report indicated that Smith was oriented to time, place, and person, with intact memory, and there was "no evidence of any disturbance of the form or content of his thinking whatsoever." Dr. LaWall indicated that Smith "probably functions in the average range of intelligence," but probably has a personality disorder with both passive-aggressive and antisocial features.

### 3.   *The Post-2005 Evaluations*

After our 2005 order, proceedings were commenced in the Arizona Superior Court, Pima County, for the sole purpose of complying with our order that the state court determine whether Arizona was prohibited from executing Smith in accordance with *Atkins*. The Superior Court noted that the burden was on Smith "to prove the claim of mental retardation by clear and convincing evidence" and that both parties acknowledged that the court was "bound to follow the decision of the Arizona Supreme Court in *State v. Grell* (*Grell II*), 212 Ariz. 516, 521, 135 P.3d 696, 701 (2006) in this regard."

Smith was subjected to testing and evaluations by experts retained by both Smith and Arizona. Testing in August 2005

---

[5] Smith apparently complained of memory problems, but there was no evaluation for organic brain syndrome or seizure disorder.

by Dr. Sergio Martinez, Arizona's expert, resulted in a finding that Smith "had an IQ score of 93 on the WAIS-III and a score of 89 on a second test, the Slosson Intelligence Test - Revised, within the low-average to average range of intellectual ability." Testing by Dr. Thomas Thompson, Smith's expert, utilizing a different appropriate testing instrument, the Reynolds Intellectual Assessment Scale with subtests, resulted in a finding that Defendant, at the time of the testing, had a score of 93. **Thus, both experts agree that as of 2005 Smith was not intellectually disabled.**

Dr. Thompson, however, was of the opinion that there was a "high probability" that Smith "was mentally retarded at the time the crime was committed in 1980, but that his functioning has improved as a result of his stable, structured prison life and appropriate medication." Dr. Thompson relied heavily on the Otis test scores from 1964, the Stanford test scores, early grades and recollections by relatives and others concerning Smith's childhood and early adolescence. Dr. Thompson appeared "to view mental retardation as a fluid condition responsive to any number of changes in a patient's environment, nutrition, and physical, mental and emotional health." He considered Smith's low test scores, low grades, lack of social skills and other deficits as valid indicators of mental retardation.

When asked about evidence of Smith's intellectual disability in 1980, Dr. Thompson referred to the 1964 IQ tests and noted that the presentence evaluation indicated that he functioned in a borderline range. However, when informed of the two Rule 11 evaluations by Drs. Levy and LaWall, he acknowledged that he would have expected retardation to have been noted in their reports.

Dr. Thompson described Smith's life after he left school as "characterized by instability in employment, personal relationships and residence, and showed signs of impulsivity and deficits of adaptive functioning, all characteristic of mental retardation." Nonetheless, he acknowledged that Smith "seemed to have some qualitative independent living skills."[6]

In contrast, Dr. Martinez, after giving Smith IQ tests and meeting with him, testified that there was a high degree of probability that he was not retarded at the time of the offense. He agreed that increases in intellectual functioning could occur within a highly enriched learning environment, but that a 30-point increase in IQ was unlikely and he did not view prison as an enriching environment.

### 4. *The Arizona Superior Court's Decision*

On March 27, 2008, the Arizona Superior Court issued a 19-page ruling that Smith had failed to show that he was intellectually disabled at the time of his trial and that Arizona was therefore not precluded by *Atkins* from executing him.

The court first held that the parties agreed that the burden to prove intellectual disability was on Smith, pursuant to *Grell II*, 212 Ariz. at 521. However, in view of the procedural differences between *Grell II* and Smith's case, the

---

[6] In reference to Smith's prior 1970 hospitalization and diagnosis for personality disorder with psychotic features, Dr. Thompson "acknowledged that this disorder included features described as 'inadequate and immature,' and that this condition included anxiety and depression which could display the impulsivity causing the job changes and relationship issues characterizing Defendant's early adulthood."

court "considered the evidence under the preponderance of evidence standard applicable to Rule 32 proceedings." The court held that Smith had failed to show that he was entitled to relief under either the clear and convincing evidence standard or the preponderance of evidence standard.

The trial court expressed serious concerns with Dr. Thompson's perspective. It noted that his view of "mental retardation as a fluid condition responsive to any number of changes in a patient's environment, nutrition, and physical, mental and emotional health," was not necessarily consistent "with the definition of mental retardation provided by Arizona law, and the procedures by which mental retardation is to be determined under A. R. S. § 13-703.02."[7] The court further noted that Dr. Thompson placed considerable weight on the 1964 IQ tests and the pre-sentence report's indication of Smith's "borderline functioning." It also observed that Dr. Thompson gave little weight to Smith's ability to live on his own for 15 years between the time he left school and the murder. The court concluded that Dr. Thompson's "analysis does not permit a finding, with any degree of accuracy, of Defendant's level of 'general intellectual functioning' either

---

[7] The state court commented:

> The State . . . contends that the family dysfunction and abuse, faulty nutrition, depression and anxiety *rather than* mental retardation contributed to the low test scores, low grades and other signs. In other words, the defense view is that Defendant's early difficulties *cause his retardation*, and that he got better in prison. The prosecution's perspective is that Defendant's dysfunctional background and other mental health problems *rather than mental retardation* caused the factors pointed to by Dr. Thompson as diagnostic of retardation.

before the age of 18, or in the period 1980–82." Thus, his evaluation "does not support the conclusion that during the pertinent time period, Defendant was mentally retarded."

The Superior Court recognized that Smith's "dysfunctional family and troubled early life undoubtedly affected his circumstances in an adverse way," and that he likely "has suffered from clinically cognizable conditions probably including a personality disorder." However, the circumstances "do not point to mental retardation with any degree of certainty." Based on all the evidence the Superior Court found that:

> Defendant has failed to meet his burden of showing that he was mentally retarded at the time of the offense and trial in this case. There was insufficient evidence from which this Court could find that Defendant exhibited "significantly subaverage general intellectual functioning" during the period of the offense and his trial. While unorthodox and unstable, Defendant's pre-arrest life did not show "significant impairment in adaptive behavior" existing concurrently with the deficit in general intellectual functioning. In the absence of adequate information concerning the early Otis IQ tests, and in view of the alternative explanations for his early school and social deficits, Defendant failed to show the onset of mental retardation before the age of 18. The Court therefore FINDS that the State of Arizona is not precluded, on *Atkins* grounds from executing Defendant.

5.  *The Arizona Court of Appeals' Opinion*

Smith appealed to the Arizona Court of Appeals, which unanimously affirmed the Superior Court. *Smith v. Kearney*, No. 2CA-SA-2008-0019, 2008 WL 2721155 (Ariz. App. Jul. 11, 2008).  It noted that the trial court "had considered the evidence under the applicable clear-and-convincing standard as well as under the lesser burden of a preponderance of the evidence standard that applies to post-conviction proceedings."  The appellate court reviewed the evidence and the Superior Court's decision noting that the trial court had found: (a) Dr. Thompson's opinion was based on an approach to defining mental retardation that was inconsistent with the requirements of Arizona law; (b) lay witness Martha Hight's opinion that Smith was mentally retarded was inconsistent with the testimony of witnesses who had lived with Smith in the 1970's; and (c) Smith's own written statements were "lengthy, neatly written, logical, detailed, structured and coherent."  The appellate court concluded that the Superior Court had carefully considered all the evidence and "exercised its discretion in resolving conflicts in the evidence, in assessing the reliability of the test results, and credibility of the witnesses, and in weighing evidence."  The court concluded that it had no basis for interfering with the Superior Court's discretionary judgments or for re-weighing the evidence.[8]

6.  *The District Court's Order Denying Habeas Relief*

Following the conclusion of his state court proceedings, Smith renewed his proceedings in the United States District

---

[8] The Arizona Supreme Court summarily denied Smith's petition for review.

Court for the District of Arizona. In a 21-page order issued on December 3, 2012, the court found that Smith's *Atkins* related claims were without merit.

The court recognized that because Smith filed his initial federal habeas petition prior to AEDPA's effective date, pre-AEDPA standards applied. Accordingly, the court reviewed de novo mixed questions of law and fact as well as pure questions of law. *See Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010). However, the court held, citing *Robinson*, that the state court factual findings were entitled to a presumption of correctness, subject to eight exceptions enumerated in the previous version of 28 U.S.C. § 2254(d).[9]

---

[9] The district court listed the exceptions as:

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair and adequate hearing in the State court proceeding; or

The district court, citing *Marshal v. Lonberger*, 459 U.S. 422, 432 (1983), held that before it could reject a state court's factual determination it would have to conclude "that the state court's findings lacked even fair support in the record." It further determined that whether Smith "is mentally retarded is a question of fact."

The district court noted that Smith did not dispute that the state court's finding as to intellectual disability was entitled to a presumption of correctness.[10] The district court

---

          (7) that the applicant was otherwise denied due process of law in the State court proceeding;

          (8) or unless . . . the Federal court on consideration of [the relevant] part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d) (1994).

[10] Smith nonetheless sought de novo review for at least one of four grounds: "(1) an inadequate factfinding procedure by the state court; (2) the failure to adequately develop material facts at the state court *Atkins* hearing; (3) the failure to provide Petitioner a full, fair and adequate hearing; and (4) a violation of Petitioner's due process rights." The district court rejected Smith's claim to a right to funding for a Positron Emission Tomography (PET) scan and his assertion that he was entitled to jury determination on mental retardation. The majority opinion does not discuss either of these claims. Rejecting Smith's other grounds, the district court noted that the "state court provided a lengthy period of time for Petitioner to prepare for the *Atkins* hearing and authorized Petitioner's expert of choice, his initial diagnostic testing requests, investigative resources, and numerous depositions of lay witnesses." It noted that Smith "identifies nothing to support a finding that the state court's factfinding procedures were inadequate, that material facts were left undeveloped, that the state court failed to provide a full and fair hearing, or that his due process rights were violated. Accordingly, the district court

concluded that there was ample evidence in the record to support the state court's conclusion that Smith had failed to establish either "subaverage general intellectual functioning" or "significant impairment in adaptive behavior" before the age of 18. In particular, the district court agreed that the 1964 Otis tests were unreliable and entitled to little weight. It noted that the record was "devoid of any evidence concerning the testing, including the raw test data, identification of the administrators and their qualifications, or the protocols followed." Moreover, both Drs. Thompson and Martinez testified that the Otis test was outdated when administered to Smith in 1964 and would not be used today to determine an individual's IQ.

The district court further commented:

> [A]s noted by the state court, the evidence presented at the hearing indicated it is just as likely that Petitioner's poor school performance and unstable lifestyle was the result of a severely dysfunctional upbringing and personality disorder as it was mental retardation. Petitioner led a transient lifestyle, frequently changing employment and residences, but many of his jobs (such as being a mechanic, a cable installer, and a truck driver) required at least a minimal degree of intellectual functioning. Although witnesses agreed that Petitioner is not "book smart," he learns quickly when shown how to do something. In addition, the record

found that Smith had not overcome the presumption of correctness on any of these grounds.

> supports a finding that Petitioner began living an independent life after dropping out of school at age 16 and was not dependent on others to function in his daily life.

The district court concluded that Smith had not overcome the presumption of correctness that attached to the state court's finding that he was not intellectually disabled at the time of the offense.

## B.  Analysis

The majority does not question the adequacy of the state court's proceedings.  Instead, invoking the eighth exception enumerated under the 1994 version of § 2254(d), it concludes that the state court's findings are "not fairly supported by the record."  Op. 11.  This is simply wrong.  An objective review of the conflicting evidence reveals that there is substantial un-refuted evidence supporting the state court's determination that Smith was not intellectually disabled in 1980.   The majority's preference for Dr. Thompson's perspective does not justify its setting aside all the evidence—including portions of Dr. Thompson's testimony—that supports the determinations by the state court and the district court that Smith has not demonstrated that he was intellectually disabled in 1980.

First, the majority cannot deny that as of 2005, Smith was not intellectually disabled.   Even Dr. Thompson's test indicated that Smith had an IQ of 93.  Thus, this case is relatively unique in that the courts are required to determine whether a person who now is clearly not intellectually disabled, was intellectually disabled some 25 years earlier when he committed a murder and was tried.  The fact that

Smith was not intellectually disabled in 2005, gives rise to at least a presumption that Smith was not intellectually disabled in 1980.

Second, the evidence supporting the majority's determination is inherently problematic. Smith's 1964 IQ tests, his poor performance on the Stanford achievement tests, and his poor grades could be signs of intellectual disability. But the test administered in 1964 was out-moded and there is nothing in the record as to how the test was administered. Also, by the time that the test was administered, Smith had failed in school, and there is nothing to suggest that he made any effort to perform well on the test.[11] Moreover, there is substantial evidence that Smith had difficulty with the written word, which indicates that his written test results were likely to underrate his intelligence.

Other than the test scores and his academic performance, the evidence of Smith's alleged intellectual disability is primarily the testimony of lay witness Martha Hight who compared Smith to her sister who had been diagnosed as intellectually disabled. However, the trial court found that her statement "was inconsistent with the testimony of others who lived with [Smith] at or near the same period of time in the 1970's."

There was evidence, as the majority notes, of Smith's horrendous childhood. That his stepfather frequently belittled him and beat him. That his mother frequently ignored her

---

[11] Dr. Martinez testified as to the importance of an awareness of an individual's behavior during an assessment. He noted that in a group-administered test you don't have the ability to "directly assess how the individual is doing, whether they're paying attention or not."

children and was promiscuous in front of them. *See* Op. 24–25. This upbringing, the majority notes, led Dr. Thompson to opine that Smith "became intellectually disabled with frontal lobe abnormalities." Op. 25.

But it is Dr. Thompson's view of intellectual disability "as a fluid condition responsive to any number of changes in a patient's environment, nutrition and physical, mental and emotional health" that renders his diagnosis problematic. If a person's mental ability is fluid, if it can change in response to changes in the person's environment, nutrition, and physical, mental and emotional health, then by definition, even assuming that Smith was intellectually disabled in 1964, when he was 16 years old, he was not necessarily disabled in 1980, when he committed the murder.

Critically, by 1980, Smith had lived independently for 15 years, had been married a number of times, and had held numerous jobs. This inherently raises questions as to whether, assuming that Smith was intellectually disabled in 1964, the subsequent improvement of his mental ability was due to his living alone away from his oppressive family for 15 years, as Dr. Martinez suggests, or to his being in prison from 1980 to 2005, as Dr. Thompson suggests. Smith's independent life from 1964 to 1980 is strong circumstantial evidence that by 1980 he was not intellectually disabled, even if he had been intellectually disabled in 1964.

In addition, Dr. Thompson's perception of intellectual disability is in tension with Arizona's definition. Arizona's statute assumes that a person's intellectual ability is relatively stable. *See* Ariz. Rev. Stat. Ann. § 13-703.02(K)(3). In fact, the statute requires that the onset of intellectual disability be before an individual is 18 years of age. Dr. Thompson's

approach begs the question of whether Smith was intellectually disabled as defined by Arizona when he was 16, or only suffered from "frontal lobe abnormalities" that affected his performance but cleared up once he was in a less toxic environment. It is not clear that the alleged "frontal lobe abnormalities" resulted in "significant subaverage intellectual functioning" or caused "significant impairment of adaptive behavior" as required by the Arizona statute. *See* A. R. S. § 13-703.02 (K).

In any event, the critical issue here is not whether Smith was intellectually disabled in 1964, but in 1980. Dr. Martinez's perspective that Smith was never disabled is certainly supported by the 2005 IQ tests. Dr. Thompson's suggestion that Smith was disabled in 1980 depends first on a determination that Smith was disabled in 1964 and second on the acceptance that prison rather than 15 years of living alone, explains Smith's present IQ level. However, as noted, Smith's ability to live on his own for 15 years from 1964 to 1980 is strong evidence that even if Smith had developed "frontal lobe abnormalities" as a result of his horrendous childhood, they had dissipated by 1980. Moreover, this conclusion is supported by the fact that the two doctors who examined Smith for competency to stand trial for the murder in 1980 failed to detect any signs of intellectual disability. Even Dr. Thompson admitted that he would have expected the doctors to note some sign of intellectual disability.

In sum, there is substantial—if not overwhelming—evidence to support the state court's determination that Smith had failed to demonstrate that he was intellectually disabled in 1980. Indeed, the majority does not really try to refute this evidence. Instead, it explains at length why it prefers Dr. Thompson's perspective to that of Dr. Martinez. But that is

not the proper inquiry. The question is whether the state court's factual determination is "fairly supported by the record." *Marshal*, 459 U.S. at 432. Perhaps if all the conflicting evidence could be explained away, the majority's approach might be acceptable. But the evidence remains obstinate in support of the state court's determinations: Smith is not now intellectually disabled, he lived independently for 15 years before he committed the murder, and the doctors who examined him for competency in 1980 failed to detect any signs of intellectual disability. Moreover, although Dr. Thompson offers an explanation for how Smith's mental ability could change over time, his own theory cannot pinpoint when Smith overcame his alleged initial intellectual disability. The factual record fully supports the state court's determinations that Smith failed to carry his burden, and that, accordingly, he was not intellectually disabled in 1980.

In addition, the Supreme Court's recent opinion in *Hall v. Florida*, 134 S. Ct. 1986 (2014), supports the denial of relief. The Supreme Court was critical of Florida's over-reliance on the measurement of an IQ test.[12] It concluded that "[i]ntellectual disability is a condition, not a number." 134 S.

---

[12] The Court explained:

> Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.

134 S. Ct. at 1995.

Ct. at 2001. It held that courts "must recognize, as does the medical community, that the IQ test is imprecise.[13] *Id*. The Supreme Court concluded:

> Florida's rule is in direct opposition to the views of those who design, administer, and interpret the IQ test. By failing to take into account the standard error of measurement, Florida's law not only contradicts the test's own design but also bars an essential part of a sentencing court's inquiry into adaptive functioning. Freddie Lee Hall may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime.

*Id*.

Here, Smith had precisely this opportunity. He had a full "opportunity to present evidence of his intellectual disability,

---

[13] The Court continued:

> This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number.

134 S. Ct. at 2001.

including deficits in adaptive functioning over his lifetime." *Id*. However, the state courts and the district court concluded that the evidence did not show that he was intellectually disabled in 1980. It is the majority and Dr. Thompson who cling to the 1964 test results. But other evidence such as Smith's 2005 IQ test results, his living independently on his own for 15 years before the murder, and the failure of the doctors who examined Smith for mental competence in 1980 to detect any sign of intellectual disability, strongly support the state court's determination.[14]

Accordingly, because the district court's denial of Smith's petition should be affirmed, I dissent from the majority's opinion.

---

[14] Finally, it should be noted that the Supreme Court in *Hall* considered the Arizona's statute and suggested that it passed constitutional muster.

> Arizona's statute appears to set a broad statutory cutoff at 70, Ariz. Rev. Stat. Ann. § 13–753(F) (West 2013), but another provision instructs courts to "take into account the margin of error for a test administered." *Id*. at § 14–753(K)(5). How courts are meant to interpret the statute in a situation like Hall's is not altogether clear. The principal Arizona case on the matter, *State v. Roque*, 213 Ariz. 193, 141 P.3d 368, (2006), states that "the statute accounts for margin of error by requiring multiple tests," and that "if the defendant achieves a full-scale score of 70 or below on any one of the tests, then the court proceeds to a hearing." *Id*. at 403.

134 S. Ct. at 1996.

## II. The Arizona Courts Applied the Appropriate Standard of Proof.

## A. The Superior Court's Use of the Words "with any degree of certainty" Does Not in Any Way Suggest that it Applied an Inappropriate Standard of Proof.

Despite the lack of any concurrence, Judge Reinhardt includes in his opinion an argument that the Arizona courts applied an unconstitutional standard of proof. Section II C.2, pages 42–52. Accordingly, I offer the following rebuttal to his inaccurate accusations.

### 1. *The State Court and District Court Decisions*

As noted, the Arizona Superior Court held extensive hearings and admitted considerable evidence as to whether Smith was intellectually disabled at the time of his trial. It agreed with the parties that the burden to prove intellectual disability was on Smith, pursuant to *Grell II*, 212 Ariz. 515. However, in view of the procedural differences between *Grell II* and Smith's case, the court "considered the evidence under the preponderance of evidence standard applicable to Rule 32 proceedings." The court held that its decision was the same under this lower standard.

After carefully considering all the evidence, the Superior Court concluded:

> Although Defendant's dysfunctional family and troubled early life undoubtedly affected his circumstances in an adverse way, and while it is likely Defendant has suffered from

clinically cognizable conditions probably including a personality disorder, the circumstances described at the hearing do not point to mental retardation with any degree of certainty. The Court has carefully considered all of the testimony presented at the hearing, and has reviewed and considered all of the exhibits received in evidence at that proceeding. Based on all of the evidence, the Court FINDS that Defendant has failed to meet his burden of showing that he was mentally retarded at the time of the offense and trial in this case. There was insufficient evidence from which this Court could find that Defendant exhibited "significant subaverage general intellectual functioning" during the period of the offense and his trial. While unorthodox and unstable, Defendant's pre-arrest life did not show "significant impairment in adaptive behavior" existing concurrently with the deficit in general intellectual functioning. In the absence of adequate information concerning the early Otis IQ tests, and in view of the alternative explanations for his early school and social deficits, Defendant failed to show the onset of mental retardation before the age of 18. The Court therefore FINDS that the State of Arizona is not precluded, on *Adkins* grounds, from executing Defendant.

The Arizona Court of Appeals affirmed the Superior Court. It noted that the trial court "had considered the evidence under the applicable clear-and-convincing evidence

standard as well as under the lesser burden of a preponderance of the evidence that applies to post conviction proceedings . . . and concluded that under either standard Smith had failed to establish he was mentally retarded at the time of the offense and at trial."

Similarly, the district court denied Smith's petition. It noted that although Smith did not "identify deficiencies in the state court's ruling," he contended that his proffered evidence "overwhelmingly established the subaverage intellectual functioning and adaptive skills prongs of Arizona's mental retardation test as of the time of the offense in 1980." The district court rejected this contention. It noted that Smith did not dispute that the 1964 Otis tests were unreliable, and commented that "the evidence presented at the hearing indicated it is just as likely that Petitioner's poor school performance and unstable lifestyle was the result of a severely dysfunctional upbringing and personality disorder as it was mental retardation." The district court concluded that there was "ample evidence in the record to support the state courts' conclusion that Petitioner failed to establish either 'subaverage general intellectual functioning' or 'significant impairment in adaptive behavior' before the age of 18." Accordingly, he had "not overcome the presumption of correctness attached to the state court's finding that he was not mentally retarded." Moreover, in denying a certificate of appealability the district court found "that reasonable jurists could not debate its resolution of Petitioner's *Atkins*-related claims," and that "[t]he question of whether the state court erred in finding that Petitioner was not mentally retarded under Arizona law is not debatable among jurists of reason."

2.  *Discussion*

In light of the unanimous perspective of the Arizona trial
and appellate courts and the district court, how does Judge
Reinhardt conclude that the Superior Court applied an
unconstitutional standard of proof?  His concurrence does so
by first disbelieving the state courts' statements that the
Superior Court applied the preponderance of the evidence
standard.  Second, the concurrence ignores the court's factual
findings and misconstrues the Superior Court's statement that
"the circumstances described at the hearing do not point to
mental retardation *with any degree of certainty*."  *See* Op. 43.
Thus, the concurrence takes five words from the trial court's
decision out of context and then gives them an improper
definition.    By attacking this incorrect definition, the
concurrence, in essence, argues that the death penalty cannot
be constitutionally applied.[15]

Both the Superior Court and the Arizona Court of
Appeals stated that the Superior Court applied the lesser
preponderance of the evidence standard.  The concurrence
dismisses their considered opinions in a footnote arguing that
the body of the Superior Court's opinion "did not fulfill that
promise, however, but, rather, the court concluded after
reviewing all the evidence that it did not meet a 'certainty'
standard."  Op. 43 n.25.  This is wrong on a number of levels.

The concurrence takes "with any degree of certainty" out
of context, endows it with a incorrect meaning and then
argues that the stilted meaning it has conjured up is

---

[15] Although Judge Reinhardt specifically addresses the constitutionality
of the Arizona death penalty statute in his separate concurrence, its spirit
clearly informs his concurrence set forth in the majority opinion.

unconstitutional. But, considering the factual evidence in this case, an objective jurist must admit to the lack of some precision in an evaluation of Smith's intellectual ability in 1980. On the one hand, there are the Otis IQ tests from 1964 and Dr. Thompson's testimony that Smith's intellectual disability was not a constant. On the other hand, both Dr. Thompson and Dr. Martinez agreed that by 2005 Smith was not intellectually disabled, and there is evidence that for some 15 years after dropping out of school, and before committing the murder, Smith lived independently and was not dependent on anyone. Thus, given that Smith had the burden to prove an intellectual disability, the Superior Court reasonably concluded that he had failed to do so, even by a preponderance of the evidence. In other words, the evidence as presented by Smith did not "point to mental retardation with any degree of certainty." Both the Arizona Court of Appeals and the District Court agreed.

But the concurrence eschews the trial court's intent and suggests that "the 'any degree of certainty' standard . . . is more akin to the 'reasonable doubt' standard than the clear and convincing standard mandated by Arizona's *Atkins* statute, which requires only that the issue under consideration be 'highly probable.'"[16] Op. 44. In support of this assertion, the concurrence cites a 27-year old Arizona case that involved a jury instruction. *State v. King*, 763 P.2d 239 (Ariz. 1988). This case, which affirmed placing the burden on the defendant to prove insanity, disapproved defining "clear and convincing evidence" as evidence that "is certain, plain to the

---

[16] Of course, this argument is only relevant if one ignores the trial court's determination, affirmed by the state court of appeals, that Smith had failed to demonstrate an intellectual disability by the preponderance of the evidence.

understanding, unambiguous, and convincing in the sense that it is so reasonable and persuasive as to cause you to believe it." *Id*. at 241. The court held that "the better instruction would inform a jury that clear and convincing evidence is evidence that makes the existence of the issue propounded highly probable." *Id*. at 244.

In Smith's proceedings, no court used the definition of clear and convincing evidence disapproved in *King*. Indeed, our precedent requires that we presume that the state judges know and follow the law. *See Lopez v. Schriro*, 491 F.3d 1029, 1043 (9th Cir. 2007). We have further held that we should not lightly disregard the trial court's determinations. *Id*. In *Parker v. Dugger*, 498 U.S. 308, 315 (1991), the Supreme Court held "[w]e must assume that the trial judge considered all this [mitigation] evidence before passing sentence. For one thing, he said he did." Thus, we have no basis for finding that the Superior Court did not apply the preponderance of the evidence standard that it said it did (and which the Arizona Court of Appeals affirmed) or that the Superior Court somehow applied "certainty" in a way that has been improper in Arizona since *King* was decided in 1988.

Furthermore, even if there were some ambiguity in the Superior Court's decision—which there is not—we would still have to construe any ambiguity in the language in the state court's favor. *See Woodford v. Visciotti*,. 537 U.S. 19, 24 (2002) ("This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law").[17] Indeed, the Supreme Court has indicated that we

---

[17] Although *Woodford* concerned review under AEDPA, the Supreme court indicated, citing *Parker*, 498 U.S. at 314–16, and other cases, that the presumption that state courts know and follow the law was established

should not "demand a formulary statement" by state courts. *Early v. Packer*, 537 U.S. 3, 9, (2002) (per curiam) (an AEDPA case, but citing a pre-AEDPA decision, *Lowenfield v. Phelps*, 484 U.S. 231, (1988), in support of its admonition). Thus, the concurrence's approach goes against both Supreme Court and Ninth Circuit case law when it not only construes the trial court's clear language as ambiguous, but then interprets the ambiguity as reflecting an unconstitutional standard.

The concurrence then proceeds to argue that *Atkins* proceedings are different. "Consequently, where a state court analyzing an *Atkins* claim fails to follow binding state law, its decision does not simply violate state law, but also violates the Eighth Amendment right provided by *Atkins* and the violation is therefore cognizable by a federal habeas court." Op. 44. Again relying on its stilted definition of "certainty," the concurrence asserts:

> Here, the "certainty" standard applied by the state trial court was plainly contrary to the clear and convincing standard required by Arizona's statute and adopted by its supreme court. *See* Ariz. Rev. Stat. Ann. § 13-703.02(G); *Grell II*, 135 P.3d at 701 ("The statute places on 'the defendant . . . the burden of proving mental retardation by clear and convincing evidence' in the pretrial hearing." (quoting § 13-703.02(G)) (alteration in original)). Accordingly, the standard of proof applied by the state trial court was not simply

before the enactment of AEDPA and thus applies to pre-AEDPA cases. *Woodford*, 537 U.S. at 24.

> contrary to state law but was also
> unconstitutional under *Atkins*, *see Williams*,
> 2015 WL 4079430, at \*4; *Black*, 664 F.3d at
> 97, and, accordingly, the state court's findings
> are not due any deference. *See Lafferty*,
> 949 F.2d at 1551 n. 4; *Walker*, 167 F.3d at
> 1345.

But this is not right. First, as noted, the state court applied the less demanding preponderance of the evidence test. Second, there is nothing in either the trial court's decision or the state appellate court's memorandum disposition that suggests that either court defined "certainty" in a way that violated *King*, 736 P.2d 239. Third, *Grell II*, which the majority cites, affirms that Smith had the burden of proving mental retardation by clear and convincing evidence. Fourth, a review of the record in this case fully supports the Superior Court's factual determination that Smith had failed either by clear and convincing evidence or a preponderance of the evidence to show that he was intellectually disabled at the time of the crime and his trial. Cherry-picking words from the trial court's decision and then giving them an incorrect meaning does not undermine the clear logic of the decision as affirmed by the state appellate court.

Perhaps aware that its first argument is less than persuasive, the concurrence offers a second argument: that "the standard of proof applied by the state trial court is unconstitutional." Op. 45. Again, based largely on its incorrect definition of "certainty," the concurrence asserts that "a 'certainty' standard of proof transgresses the limits of the state's authority to craft appropriate procedures to enforce *Atkins* and, in doing so, encroaches on the substantive constitutional right." Op. 45.

This argument appears, in essence, to be an argument against the constitutionality of the death penalty. The majority claims that it does not "need to determine what standard of proof the federal Constitution requires," but "only whether the Arizona court applied a standard it forbids." Op. 45. It posits that "[w]hen the natural operation of a state's procedures for rendering factual determinations transgresses a substantive constitutional right, those procedures are unconstitutional." Op. 46. The concurrence argues that "[i]t is elementary that the 'natural operation' of applying a heightened standard of proof can determine the outcome of litigation, and thus the availability of a constitutional right."[18] Op. 46.

The concurrence next objects to the death penalty based on the "inherent imprecision of psychiatric determinations of mental illness." Op. 49. Citing *Addington v. Texas*, 441 U.S. 418, 430–32 (1979), it comments: "[a]s the Supreme Court explained in rejecting the argument that the Constitution requires use of a reasonable doubt standard in the context of civil commitment proceedings, the unique nature of psychiatric diagnosis renders factual determinations uniquely unsusceptible to certainty." Op. 47. The concurrence posits that when, as in this case, the determination of an individual's intellectual ability at the time of the crime is not made until years after the crime, certainty is "even less attainable and a

---

[18] The concurrence's authority for these assertions is a 1911 Supreme Court opinion, *Bailey v. Alabama*, 219 U.S. 219 (1911), which held that an Alabama statute that created a presumption of intent to injure violated the 13th Amendment.

certainty standard is even less constitutionally acceptable in such cases."[19]  Op. 49–50.

The concurrence concludes with the assertion that capital punishment requires a "heightened degree of certainty."  Op 50.   Accordingly,  "where,  as  in  *Atkins*,  the  Eighth Amendment  renders  a  class  of  individuals  categorically ineligible  for  execution,  the  procedures  used  to  determine whether a defendant falls into that class may not allocate nearly all of the risk of an erroneous determination to the defendant."  Op. 51.  It reasons that by requiring Smith to demonstrate  with  a  "degree  of  certainty"  that  he  was intellectually disabled, the Arizona court allocated "nearly the

---

[19] In footnote 26, the concurrence asserts:

> It is of no consequence to the analysis that *Addington* and *Atkins* involve different *burdens of proof* than the case at bar, because the focus here is on the effect of the *standard of proof*.  Under *Addington*, a state desiring the civil commitment of an individual must demonstrate that  he  suffers  from  mental  illness,  whereas  under *Atkins* an individual seeking to avoid execution by the state must demonstrate intellectual disability.  In both situations,  the  determination  heavily  relies  upon psychiatric  opinion,  and  thus  in  both  situations  a standard of proof requiring "any degree of certainty" as defined by Arizona law will often render it impossible for a party to carry its burden. *See Addington*, 441 U.S. at 432.

Again, this argument is based on the concurrence's misinterpretation of the trial court's decision.  Deciding whether a person has carried his burden of showing an intellectual disability may well be difficult, but here the state court carefully did so.  Indeed, it is telling that the majority attacks the decision by giving the words "any degree of certainty" a meaning that they do not have.

entire risk of an erroneous determination to Smith." Op. 51. Thus, according to the concurrence, because "the factual determination in question concerned an issue for which certainty may be unattainable . . . and a penalty for which a greater degree of reliability is required . . . [,] the constitutional violation [is] even more clear." Op. 51–52.

Judge Reinhardt is certainly entitled to his opinion, but it is not the opinion of the panel or of the Ninth Circuit. The concurrence is clearly contrary to the position of the Arizona Supreme Court. *State v. Grell (Grell III)*, 135 P.3d 696, 702 (Ariz. 2006) (en banc) ("We find no constitutional bar to imposing the burden of proving mental retardation on the defendant."). The concurrence cites no Ninth Circuit case to support its perspective. And it is not supported by any decision by the United States Supreme Court, which denied certiorari in *Grell II (Grell v. Arizona*, 127 S. Ct. 2246 (2007)), and accepted certain provisions of Arizona's proceedings in *Hall*, 134 S. Ct. at 1996–97.

In sum, the assertion that the Arizona courts applied an unconstitutional standard of proof fails first because it misconstrues the Arizona Superior Court's decision, and ignores the ruling of the Arizona Court of Appeals, contrary to both Supreme Court and Ninth Circuit precedent. *See Woodford*, 537 U.S. at 24; *Parker*, 498 U.S. at 315; *Lopez*, 491 F.3d at 1043 (stating "there are ways to construe the state court's ruling that would not make it 'clearly untenable,' and we are therefore bound by the state courts' interpretation and application of its own procedural rules."). The second arrow in the concurrence's quiver—that there is not sufficient certainty to impose the death penalty on Smith—similarly lacks support from either the Supreme Court or the Ninth Circuit, as Arizona's placement of the burden on the

defendant to prove his intellectual disability has not been disturbed in the eight years that have passed since the Arizona Supreme Court decided *Grell II* in 2007.

### III.     Conclusion

The district court's denial of the Smith's petition should be affirmed because an objective review of the extensive record reveals that there is substantial evidence, if not overwhelming evidence, that Smith failed to meet his burden of showing that he was intellectually disabled in 1980–82, when he murdered Sandy Owen and was tried, convicted and sentenced. At a minimum, this conclusion is compelled by the undeniable facts that: (a) Smith in 2005 had an IQ between 87 and 93; (b) Smith lived independently and supported himself for 15 years after he dropped out of school and before the murder; and (c) the doctors who examined Smith in 1980 to determine his competency to be tried found no signs of intellectual disability.    Furthermore, Dr. Thompson's approach of considering intellectual ability to be fluid, while allowing for Smith's alleged intellectual disability to dissipate, offers no assurance as to when it did so.    The state courts took Smith's claim of intellectual disability seriously, and gave his assertions and the evidence full consideration. An objective review of this record will not support a finding—and certainly not a finding by this court on review of a state habeas petition—that Smith met his burden of showing that he was intellectually disabled in 1980. I

would affirm the district court's denial of Smith's petition[20] and I therefore dissent.

---

[20] I would also affirm the district court's holding that Smith has failed to demonstrate cause to overcome his procedural default of his ineffective assistance of counsel claim. His invocation of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) fails because he has not demonstrated ineffective assistance of counsel in his first state post-conviction proceeding, and even if he did, this would not excuse Smith's new counsel from raising ineffective assistance of trial counsel in Smith's second state post-conviction proceeding. Moreover, Smith has not shown a reasonable probability that he received ineffective assistance of counsel at sentencing. *See Strickland v. Washington*, 466 U.S. 668 (1984). Smith's other arguments are unavailing. He fails to demonstrate the existence of a conflict of interest pervading the Pima County Public Defender's Office; the state habeas court's denial of a psychological exam does not provide cause for his procedural default; and to the extent that his claim was not covered by *Stewart v. Smith*, 536 U.S. 856, 860–61 (2002), the state court's application of its post-conviction waiver rule is adequate and independent.